# HERRERA v. UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 89. Argued December 11, 12, 1911.—Decided January 15, 1912.

War makes the citizens or subjects of one belligerent enemies of the government, citizens and subjects of the other.

During the war with Spain Cuba was enemy's country; and all persons residing there pending the war, whether Spanish subjects or Americans, were to be deemed enemies of the United States, and their property enemy's property and subject to seizure, confiscation and destruction.

Property in the harbor after the capitulation of Santiago remained enemy property, and seizures thereof by the United States were acts of war.

Nothing in the President's proclamation of July 13, 1898, militated against the right of the United States to confiscate enemy's property for the use of the army of occupation.

There is a distinction between the capture of an enemy's port in a war with a foreign country, and the restoration of national authority over territory in a civil war and in the protection of property after capture. *The Venice,* 2 Wall. 258, distinguished.

There is a distinction between a seizure of private property of an enemy for immediate use of the army and the taking of such property as booty of war. *Planters Bank* v. *Union Bank,* 16 Wall. 483.

Under the prohibitions of the Tucker Act, the Court of Claims has no jurisdiction for claims for seizures made in Santiago after its capitulation in violation of the President's proclamation of July 13, 1898, or of the laws of war.

Right of Spanish subjects against the United States for indemnity for illegal seizures and detention of property during the war of 1898 was taken away by the treaty of peace. *Hijo* v. *United States,* 194 U. S. 315.

43 Ct. Cl. 430, affirmed.

THE facts, which involve the jurisdiction of the Court of Claims and the liability of the United States for use of enemy vessels seized during the war with Spain, are stated in the opinion.

*Mr. Howard Thayer Kingsbury* and *Mr. Crammond Kennedy*, with whom *Mr. Frank D. Pavey* was on the brief, tor appellants:

The President's instructions of July 13, 1898, govern the case at bar; and, while they were framed to meet the situation created by the capitulation of Santiago, they are in accordance with the laws of war defining the reciprocal rights and obligations of the occupying power and the inhabitants of the occupied territory—see decision of Sir William Scott (Lord Stowell) in the prize cases at capitulation of Genoa, 4 Robinson, Adm. Reps. 388. If the shipping was seized before the capitulation and not released by any of the articles, it could be held by the captor for condemnation or ransom, but if the seizure was made after that time, it would be considered, not as the exercise of any rights of war but as mere lawless rapine and plunder. See also 3 Phillimore's Int. Law, 3d ed. 192.

As to legal effect of military occupation on the inhabitants and their property in the occupied territory, see *The Venice*, 2 Wall. 258, a vessel seized after capture of New Orleans, in which it was held that the vessel though undoubtedly enemy's property at the time she was anchored in Lake Pontchartrain, could not be regarded as remaining such after the sixth of May.

This opinion was unanimous, and it has been cited by this court with approval in the following cases: *The Baigorry,* 2 Wall. 481; *The Reform,* 3 Wal.. 617; *The Peterhoff,* 5 Wall. 60; *Ouachita Cotton,* 6 Wall. 531; *The Grapeshot,* 9 Wall. 131; *United States* v. *Padelford,* 9 Wall. 541; *Levy* v. *Stewart,* 11 Wall. 253; *Mail Co.* v. *Flanders,* 12 Wall. 134; *Hamilton* v. *Dillin,* 21 Wall. 94; *Desmare* v. *United States,* 93 U. S. 611; *Burbank* v. *Conrad,* 96 U. S. 301; *Clark* v. *United States,* 99 U. S. 496.

In *Cross* v. *Harrison,* 16 How. 164, it was held that the formation of the civil government in California,

when it was effected, was the lawful exercise of belligerent right over a conquered territory, and that this power is given by the law of nations for the purpose of protecting the inhabitants of the occupied territory and their persons and property. And it is for this reason that, both under the common law and the law of nations, conquered states or districts retain their old laws until the conqueror or military occupant thinks fit to alter them. See *Planters Bank* v. *Union Bank*, 18 Wall. 483.

All of the most recent authors concur in this view. See especially Les Requisitions Militaires du Temps de Guerre by Ch. Pont, 85, 86; Latifi's "Effect of War on Property," London, 1909, 30; Bernier, "De l'Occupation Militaire," 108; Kent's Comm. 14th ed. 92.

The rules and regulations prescribed by the President in his instructions of July 13, 1898, to the Secretary of War, were in accordance with the laws governing the firm and permanent occupation of enemy territory, apart from the fact of capitulation (as distinguished from capture by assault), or from the fact that the capitulated territory was held by the United States "in trust for the people of Cuba." *Neely* v. *Henkle*, 180 U. S. 109, 120. These rules were substantially the same as those formulated by the Brussels Conference in 1874 for the military occupation of enemy territory and incorporated in 1899 into the "Convention as to the Laws and Customs of War on Land," adopted at The Hague, to which the United States and all the leading powers of the world have become parties.

These rules are substantially the same as Lieber's Code (General Order, No. 100), any differences being due to the fact that the latter were prepared for the conduct of the Army of the United States in a civil war in which the enemy was regarded as traitors and rebels and not (as in an international war) where each side is respected as doing its duty to its own country. General Orders No. 101

were issued specifically to govern the situation resulting from the capitulation of Santiago. As to effect of such orders see *United States* v. *Eliason*, 16 Pet. 291, 302.

As to sanctity of private property during war, as recognized by the United States, see treaty with Prussia of 1788, Art. XXIII, and treaty of 1848 with Mexico, in which both countries "solemnly pledged themselves to each other and the world" to observe the same rules "upon the entrance of the armies of either nation into the territories of the other."

Two centuries earlier the sanctity of private property was stated in the strongest terms by Grotius (De Jure Belli et Pacis, Lib. III, Ch. XX, § VII, par. 1).

In the code of Moses, barbarous as it was, a very much more humane treatment was prescribed for enemies who surrendered. (Deut. XX: 10–14.)

The claimants were not Spanish subjects in the sense of the treaty, and their claims were not released by Spain to the United States. *Hijo* v. *United States*, 194 U. S. 315, does not apply to this case.

There was no way provided in the treaty by which persons born in the island—the people of Cuba—like the claimants in No. 90, could preserve Spanish nationality and allegiance which they threw off when they declared their independence in 1895 and of which they were relieved (so far as the United States was concerned) by the declaration of their independence in and by the Joint Resolution of Congress of April 20, 1898. The claimants in No. 89 could have retained their Spanish nationality and allegiance under Art. IX, but they refused to do so because they had cast in their lot with the people of Cuba, thus becoming under the constitution of Cuba citizens of that republic by naturalization.

When an act is done at one time and it operates upon the thing as if done at another time, it is said to do so by relation. 2 Bouvier's Dic., Rawle's Revision, 864; 24

Am. & Eng. Ency. Law, 2d ed. 275. The doctrine of relation as to the commencement of the existence and responsibility of states, also as to their title to their territory, and the citizenship of their people, applies to Cuba.

As the revolution succeeded, and the republic became recognized, its acts from the commencement of its existence are upheld as those of an independent nation. *Williams* v. *Bruffy*, 96 U. S. 176. See also *Harcourt* v. *Gaillard*, 12 Wheat. 524, 527; *M'Ilvaine* v. *Coxe's Lessee*, 4 Cranch, 209, 212; *Underhill* v. *Hernandez*, 168 U. S. 250, 253, citing *United States* v. *Rice*, 4 Wheat. 246; *Fleming* v. *Page*, 9 How. 603; *Thorington* v. *Smith*, 8 Wall. 1; *Ford* v. *Surget*, 97 U. S. 594; *Dow* v. *Johnson*, 100 U. S. 158; *United States* v. *Trumball*, 48 Fed. Rep. 94. See also *Inglis* v. *Sailors Snug Harbor*, 3 Pet. 99.

Children born in Santiago after the capitulation, while the United States was holding the capitulated territory "in trust for the people of Cuba" were not Spaniards by birth.

For application of the doctrine of relation in international arbitrations, see *Heny's Case* in Ralston's Rep. 17; The *Dix Case*, Ralston's Rep. 8; the *Puerto Cabello Railway Company Case*, Ralston's Rep. 458; the *Bovallins* and *Hedlund Cases*, Ralston's Rep. 952. For other cases see 4 Moore's Int. Arb'ns, No. 4330.

The releases in both cases were obtained under duress. *Swift Co.* v. *United States*, 111 U. S. 28; *Maxwell* v. *Griswold*, 10 How. 242, 256; *Adams* v. *United States*, 20 Ct. Cl. 115; *Bostwick* v. *United States*, 94 U. S. 53; *Rush* v. *United States*, 35 Ct. Cl. 239; *Robertson* v. *Frank Bros. Co.*, 132 U. S. 17.

*Mr. Assistant Attorney General Thompson*, with whom *Mr. Franklin W. Collins* was on the brief, for the United States.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Petition in the Court of Claims for the recovery of $88,200 for the value of the use and profits of which claimants were deprived, as it is alleged, by the taking and detention of a certain steamship by the United States during the war with Spain, and for the loss of certain property belonging to and a part of such steamship alleged to be "fairly worth" the sum of $5,000, amounting in all to the sum of $93,200.

Claimants base their right to recover upon an implied contract arising from the facts which we shall presently detail. Opposing this view, the Government contends that the property was enemy property seized for military uses and that, besides, the record does not show a "convention between the parties" or circumstances from which a contract could be implied, and that therefore the case is one sounding in tort and claimants have no right of recovery.

The court found as a conclusion of law from the facts, "on the authority of the case of *Hijo* v. *United States*, 194 U. S. 315, that the claim herein is one arising from the capture and use of a vessel as an act of war, and the court is therefore without jurisdiction, and the petition is dismissed."

The claimants, at the time the steamship was taken, composed a commercial partnership, doing business under the firm name of Herrera Nephews. They were born in Spain, and, under the Spanish régime in Cuba, were Spanish subjects residing in Havana. After the treaty they did not, in accordance with its terms, preserve their allegiance to Spain.

On the sixteenth day of July, 1898, the Spanish forces then occupying the territory constituting the division of Santiago, including the city and port of that name, capitu-

lated to the United States in accordance with the terms of a military convention which provided that all hostilities between the American and the Spanish forces in that district should cease and that the Spanish forces should be returned, at the expense of the United States, to Spain. Actual hostilities ceased with the surrender of Santiago.

The United States military authorities seized and captured the steamer *San Juan* on the seventeenth of July, 1898, she having been held in the harbor by its blockade by the United States naval authorities. Prior to that date she had been used to transport Spanish troops, munitions of war and supplies for the Spanish troops from place to place. After her capture she was used for like service for American troops and indigent Cubans until November, 1898, a period of 115 days. The reasonable value of her use was $150 per day, amounting to the sum of $17,250, no part of which has been paid to claimants.

After the surrender of Santiago and the seizure of the steamship, the Secretary of War, on July 18, 1898, in pursuance of the proclamation of the President of July 13, 1898, issued General Order No. 101, which, among other things, provided that "Private property, whether belonging to individuals or corporations, is to be respected, and can be confiscated only for cause. Means of transportation, such as telegraph lines and cables, railways and boats, may, although they belong to private individuals or corporations, be seized by the military occupant, but unless destroyed under military necessity, are not to be retained.

"Private property taken for the use of the Army is to be paid for, when possible, in cash, at a fair valuation, and when payment in cash is not possible receipts are to be given."

This order was promulgated in Cuba, July 20, 1898.

On November 8, 1898, the Quartermaster-General of the Army telegraphed to R. A. C. Smith, the representa-

tive and attorney-in-fact of claimants, that it was proposed
to return the "captured steamer" to owners, and asked
him to wire their names.   Smith answered on the twelfth
"that claimants agreed to accept the vessel, reserving
their right to make claim."   On the fifteenth the War De-
partment notified Smith that the Government was ready
to deliver the vessel to her owners upon condition that a
receipt be given showing that she was accepted with full
knowledge and understanding that the Secretary of War
did not consider that any allowance was due the owners on
account of her use, she being captured property, or for
any damage sustained by her while she was in the posses-
sion of the United States, and that any claim subsequently
made should be a matter for future consideration by the
War Department.  The terms were rejected and she re-
mained in the possession of the United States.

On April 25, 1899, the Quartermaster at Santiago, on
instructions from the War Department, wrote claimants'
agent that if they did not receive the steamer "in accord-
ance with the conditions hereinafter expressed," she would
be delivered to the Department of the Quartermaster
of the Army and retained as property of the United
States.

On the seventeenth claimants accepted her and gave
the following receipt:

"Received this 17th day of May, 1899, at Santiago,
Cuba, from Maj. John' T. Knight, quartermaster, U. S.
Army, chief quartermaster Department of Santiago, the
steamship *San Juan*, which vessel is accepted with the full
knowledge and understanding that the Secretary of War
does not consider that any allowance is due the owners on
account of the use of the vessel, she being captured prop-
erty, or for any damages sustained while the vessel has
been in possession of the United States Government, the
return of the vessel being a generous act on the part of
the United States Government, and that any claim subse-

quently made for such use and damages shall be a matter. for future consideration of the War Department.

"And we name and authorize our agents in Santiago de Cuba—Messrs. Gallego, Mesa & Co., of said city— to receive and take possession of said steamship *San Juan.*"

They also executed a paper which recited that it was given in consideration of the prompt return of the vessel to claimants, and that released the Government and its officers and agents "from all manner of actions, damages, claims and demands whatsoever" on account of her seizure, detention and use.

From the time that the Quartermaster-General of the Army proposed to return the vessel until May 17, 1899, a period of 190 days, the vessel, though retained by the United States, was not used. During said period the United States kept a watchman on board, who was paid $45 per month. The compensation claimants are entitled to, if any, for such period, taking into account that the vessel was not used, would be $125 per day, or $23,750.

Upon the return of the vessel to claimants, tools and implements of the value of $232.50 were missing, but it is not shown by whom they were taken. No other property is shown to have been taken possession of by the United States. The steamer, when returned, appeared to have been in as good condition as when taken into possession, ordinary wear and tear excepted.

As we have seen, the Court of Claims rested its decision on the case of *Hijo* v. *United States*, 194 U. S. 315, and that case also is the main reliance of the Government's argument. Claimants, however, contend that the *Hijo Case* is distinguishable from that at bar.

The action there was brought to recover the value of the use of a vessel belonging to Spanish subjects and taken by the United States in the port of Ponce, Porto Rico, when that city was captured by the United States army and

navy on July 28, 1898. The vessel was used by the quartermaster until some time in April, 1899, when she was ordered to be returned to the owner, if all claims for damages for use or detention should be waived. The condition was refused, and the vessel was subsequently abandoned and was wrecked in a hurricane. We quote the following from the statement of facts in the opinion: "The vessel was never in naval custody nor condemned as prize. When seized it was a Spanish vessel, carried a Spanish flag, and its owner, captain and crew were all Spanish subjects. It did not come within any of the declared exemptions from seizure set forth in the proclamation of the President of April 26, 1898. 30 Stat. 1770. A claim filed in the War Department in February, 1900, for its use, was rejected."

The Court of Claims dismissed the petition on the ground that the vessel was properly seized as enemy property and its use was by the war power for war purposes. This court sustained the judgment and the principles upon which it was based.

A question of jurisdiction became prominent in the case. The action was brought in the District Court of Porto Rico, and the court could only have had jurisdiction under the Tucker Act, so called, which provides for the bringing of suits against the United States. March 3, 1887, 24 Stat. 505, c. 359. In other words, as expressed in the act, omitting grounds of action with which the case was not concerned, that court was given jurisdiction of suits "upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort." Considering whether the action was of that nature, this court said that there was no element of contract in the case, for nothing was done or said by the officers of the United States from which could be implied an agreement or obligation to pay for the use of the vessel; and declared, further, that according to

established principles of law, its owners, being Spanish
subjects, were to be deemed enemies, although not di-
rectly connected with military operations, and that there-
fore the vessel was to be deemed enemy's property. "It
was seized," it was said, "as property of that kind, for
purposes of war, and not for any purposes of gain." In
further emphasis of this conclusion, it was added: "The
seizure, which occurred while the war was flagrant, was an
act of war occurring within the limits of military opera-
tions. The action, in its essence, is for the recovery of
damages, but as the case is one sounding in tort, no suit for
damages can be maintained  .  .  .   against the United
States."

It was also decided that the claim of the plaintiff in the
action was embraced in the stipulation in the treaty of
peace between Spain and the United States, by which
they "mutually relinquish all claims for indemnity, na-
tional and individual, of every kind, of either Government,
or of its citizens or subjects, against the other Govern-
ment, that may have arisen since the beginning of the
late insurrection in Cuba and prior to the exchange of
ratifications of the present treaty, including all claims for
indemnity for the cost of the war.  . . .  ." That effect,
it was declared, must be given to the treaty, even though
the Tucker Act could have been construed to authorize
the suit, upon the ground that each being equally the
supreme law of the land, the last in date must prevail in
the courts.

Before comparing that case with the case at bar we may
take a glance at *Juragua Iron Co.* v. *United States*, 212
U. S. 297, 306, where it was decided that, Cuba being
"enemy's country," even "an American corporation doing
business in Cuba was during the war with Spain, to be
deemed an enemy to the United States with respect of
its property found and then used in that country, and such
property could be regarded as enemy's property, liable to

be seized and confiscated by the United States in the progress of the war then being prosecuted."

The action in that case was in the Court of Claims to recover from the United States the alleged value of certain property destroyed in Cuba during the war with Spain, by order of the officer commanding the United States troops operating in the locality of the property, the purpose of the order being "to destroy all places of occupation or habitation which might contain fever germs." The buildings destroyed were 66 in number and were used in connection with mining operations and the manufacture of iron and steel products.

The destruction of the buildings was considered as an act of war and sustained as such. It was also decided, that, even on the supposition that such destruction was wrongful and unnecessary a tort was committed, and though committed in the interest of the United States, there was no element of contract and the action was not one of which the Court of Claims could "take cognizance, whatever other redress was open to the plaintiff."

We have, then, these propositions established: Cuba was enemy's country, and all persons residing there pending the war, whether Spanish subjects or Americans, were to be deemed enemies of the United States, their property enemy's property and subject to seizure, confiscation and destruction. It would seem necessarily to follow that the claimants in this case were enemies of the United States, and their property subject to the necessities of war. And this is but the application of the rule which declares that war makes of the citizens or subjects of one belligerent enemies of the government and of the citizens or subjects of the other. *The Venice*, 2 Wall. 258, 274; *White* v. *Burnley*, 20 How. 235, 249.

These consequences, it is insisted, are averted in the case at bar by two important circumstances: that Santiago, unlike Porto Rico, was not captured but capitulated,

and by the explicit direction of the proclamation of the President of July 13, 1898, promulgated in Cuba on the twentieth. The argument is that those circumstances modified the general rule, and that the property of claimant ceased to be "hostile" and passed "under the sovereignty" of the United States, and as inviolable as other property under the jurisdiction of the United States, and, if taken for public use, an obligation to make compensation would be implied. *The Venice,* 2 Wall. 258, and other cases are adduced to support the contention. It was decided in *The Venice* that after the surrender of New Orleans its military occupation by the Federal forces "drew after it the full measure of protection to persons and property consistent with a necessary subjection to military government." The limitation is important. The case is not as broad as the contention which it is cited to support. It was concerned with the restoration of the authority of the United States over a part of the United States which had been in a state of insurrection, and in such case, that is, in districts occupied by national troops, it was "the policy of the Government not to regard such districts as in actual insurrection, or their inhabitants as subject in most respects to treatment as enemies." Such occupation, it was said, did not "restore peace, or, in all respects, former relations;" but it replaced "rebel by national authority," and recognized, "to some extent, the conditions and the responsibility of national citizenship." In emphasis of the same view, it was said: "As far as possible the people of such parts of the insurgent States as came under national occupation and control were treated as if their relations to the National Government had never been interrupted."

*The Ouachita Cotton,* 6 Wall. 521, does not change the ruling in *The Venice* from an expression of the special policy of the Government indicated by its legislation to a declaration of law necessarily following from the military occupation of even enemy country. It was an obvious

application of the principles of *The Venice* to hold that, with the restoration of the national authority, "from that time its citizens were clothed with the same rights of property, and were subject to the same inhibitions and disabilities as to commercial intercourse with the territory declared to be in insurrection, as the inhabitants of the loyal States," and that "such is the result of the application of well settled principles of public law." To the same effect is *Desmare* v. *United States*, 93 U. S. 605, 611. Nor was there any intention to enlarge the ruling in *The Venice* in *United States* v. *Padelford*, 9 Wall. 531.

The case of *The Grapeshot*, 9 Wall. 129, 132, is also cited by claimants, and some of its language demands notice. The question involved was the legality of a provisional court for the State of Louisiana established by the President after New Orleans and parts of the State had been occupied by the national troops. Expressing the purpose of the National Government the court said that it was "neither conquest nor subjugation, but the overthrow of the insurgent organization, the suppression of insurrection, and the reëstablishment of legitimate authority." It was further said that it was the duty of the Government, "wherever the insurgent power was overthrown, and the territory which had been dominated by it was occupied by the National forces, to provide as far as possible, so long as the war continued, for the security of persons and property, and for the administration of justice." To this was added the following: "The duty of the National Government, in this respect, was no other than that which devolves upon the government of a regular belligerent occupying, during war, the territory of another belligerent. It was a military duty, to be performed by the President as commander-in-chief, and intrusted as such with the direction of the military force by which the occupation was held.

But it was not intended to express a limitation upon

the undoubted belligerent right to use and confiscate all property of an enemy and to dispose of it at will. *Miller* v. *United States*, 11 Wall. 268, 305. *The Venice*, and cases like it, expressed and enforced limitations to a certain extent upon such right growing out of the policy of the Government. It may be, as said by Kent (1 Kent, 92), that "The general usage now is, not to touch private property upon land, without making compensation, unless in special cases, dictated by the necessary operations of war, or when captured in places carried by storm, and which repelled all the overtures for capitulation." It may also be, as further said by the learned commentator, that "if the conqueror goes beyond these limits wantonly, or when it is not clearly indispensable to the just purposes of war, and seizes private property of pacific persons for the sake of gain, . . . he violates the modern usages of war." Id. 92 and 93.

If the record presented such a case the question could be raised whether it presented one for judicial cognizance, even if a court could share the indignation which the learned commentator says all mankind would feel. It is certain that the court's power cannot be enlarged by its emotions. Besides, we must regard the seizure of the *San Juan* as an exertion of the war power, and by this we do not mean as mere "booty of war," and the comments made in *Planters' Bank* v. *Union Bank*, 16 Wall. 483, 495, in regard to an attempt by the commander at New Orleans, fifteen months after the occupation of the city by the National Government, to confiscate the indebtedness of one of the banks to the other, do not apply. We only mean that the seizure was for the immediate use of the army, a right recognized in that case, for we do not accept the view contended for by claimants that with the surrender of Santiago and the cessation of active operations in the Santiago district enemy property lost such character and was not subject to such right of capture. The war

was flagrant elsewhere, and in such case *Planters' Bank* v.
*Union Bank* is authority for the right, not against it. It
was there decided that the military commander at New
Orleans "had power to do all that the laws of war per-
mitted, except so far as he was restrained by the pledged
faith of the Government, or the effect of congressional ac-
tion." Such pledge and effect existed, it was held, citing
the case of *The Venice.* It may be said the indebtedness
was not absolutely exempt from confiscation as enemy's
property, but only that it was not, under the particular cir-
cumstances, "subject to military seizure as booty of war."
And "booty of war" was distinguished from "a seizure
for immediate use of the army." This is a distinction im-
portant to observe, and is recognized explicitly or implic-
itly in all of the cases and references contained in the able
argument of counsel. It accommodates, when its full
range is properly understood, the necessities of the con-
queror and the personal and property rights, if they may
be called such, of the conquered. And there is nothing in
the President's proclamation of July 13, 1898, which mili-
tates against it. But suppose we should grant the contrary.
Suppose we should grant to the *San Juan* the broadest
immunity from seizure or detention. We are then brought
to consider the quality of the act of the officers of the army
who seized and used her. It would seem easy to describe.
If it was done in violation of the President's proclamation;
if it was done in violation of the laws of war and the con-
ditions arising from the capitulation of Santiago, it was
done in wrong, and claimants encounter the prohibitions
of the Tucker Act against the jurisdiction of the Court of
Claims. They are in the situation of the claimant in *Hijo*
v. *United States* and *Juragua Iron Co.* v. *United States.*
A tort was committed against them, and though com-
mitted in the interest of the United States, there is no
element of contract and the action is one of which the
Court of Claims could not take jurisdiction, whatever

other redress is open to claimants. Indeed, we might have rested this branch of the case on those cases, both for the requirements of the Tucker Act and the rights and powers of belligerents, conqueror or conquered. We have restated the propositions declared only in deference to the earnestness and force of the argument of claimants' counsel. And we rest the case on those propositions and do not enter into a consideration of the citizenship of claimants, whether born in Spain and Spanish subjects when their vessel was seized, or Cuban by relation to the time either of the declaration of Cuban independence or of its recognition by Congress, as contended. If Spanish subjects, under the authority of *Hijo* v. *United States*, their right of indemnity for the seizure and use of their vessel was taken away by the treaty between Spain and the United States.

*Judgment affirmed.*