**STANDARD-VACUUM OIL COMPANY**
v.
**The UNITED STATES.**
No. 50336.

United States Court of Claims.
July 12, 1957.

George S. Collins, New York City, for plaintiff. Warrack Wallace and Leonard F. Hoefler, Jr., New York City, were on the briefs.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is an action in which plaintiff seeks to recover damages for the alleged use of certain properties by the United States which are owned by plaintiff and located in Japan.

The paramount question to be answered here is whether the properties in question were taken by the United State. for which plaintiff can be compensated under the fifth amendment to the Constitution.

The facts clearly show that the property in question was taken from plaintiff by the Imperial Government of Japan after the outbreak of hostilities, under the provisions of the Japanese Enemy Property Custody Law (No. 99 of December 22, 1941) and Japanese Imperial Ordinance Relative to the Enforcement of Enemy Property Custody Law (Imperial Ordinance No. 1179 of December 1941).

Title to and custody of the properties were registered and recorded in the name of the Enemy Property Custodian appointed by the Japanese Ministry of Finance.

At the time of seizure, Japan was a sovereign independent nation having power and jurisdiction over all property within its territory, and its actions with respect to plaintiff's properties were legally valid and divested the plaintiff of any interest in them. Ricaud v. American Metal Co., 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733; Shapleigh v. Mier, 299 U.S. 468, 471, 57 S.Ct. 261, 81 L.Ed. 355.

On August 14, 1945 (U. S. time) the Japanese Government accepted the provisions of the Potsdam Declaration of July 26, 1945, defining the terms for Japanese surrender, and offering to surrender unconditionally to the Allied Powers. This offer was accepted on the same day and the Japanese Government was ordered to cease hostilities and formally surrender to the Supreme Commander for the Allied Powers at a time and place to be designated by him. After the instrument of surrender was signed, the authority of the Japanese Government to rule the state was made subject to the Supreme Commander for the Allied Powers. The instrument of surrender was accepted by the Supreme Commander for the Allied Powers for the United States, the Republic of China, the United Kingdom, and the Union of Soviet Socialistic Republics, and in the interests of the other United Nations at war with Japan, and was also signed by represen-

tatives of nine powers at war with Japan. Immediately thereafter General Douglas MacArthur was named Supreme Commander for the Allied Powers and commenced the military occupation and control of Japan.

On September 3, 1945, the Supreme Commander for the Allied Powers issued a directive to the Japanese Government requiring it to place at the disposal of the occupation forces of the Allied Powers all local resources required for their use. Procurement regulations were established for the acquisition of facilities and the properties in question were subjected to demand from the Japanese Government.

Under the Far Eastern Commission's policy decision and directive of March 6, 1947, the Supreme Commander for the Allied Powers was authorized to restore to the allied owner property which had been seized by the Japanese Government. Pursuant to such authorization, the Supreme Commander for the Allied Powers issued instructions to the Japanese Government concerning the procedure to be followed in effecting restoration of the property to the allied owner.

The plaintiff filed demands for the return of each of the properties in question with the Supreme Commander for the Allied Powers, and supplemented them with final requests for restoration in accordance with procedures established by the Supreme Commander for the Allied Powers. In each of its final requests the plaintiff stated:

"We understand that General Headquarters, Supremé Commander for Allied Powers, and the Japanese Government will be relieved of all preservation, maintenance and custodial responsibilities with respect to said property after the date set for restoration, consistent with the procedure for physical repossession of property under Procurement Demand."

Pursuant to such demands for the return of property and final requests for restoration, the Supreme Commander for the Allied Powers directed the Jap-

anese Government to return the properties to the plaintiff. In those instances where the property was being used by the Occupation Forces, the plaintiff was informed that physical possession could not be effected until such time as the property was no longer required by the Occupation Forces.

The military control and occupation of Japan under the sole executive authority of the Supreme Commander for the Allied Powers began on September 2, 1945, and from its inception the occupation of Japan was an allied undertaking and responsibility. The use of the properties in question was determined by the Supreme Commander for the Allied Powers to be necessary to the occupation of Japan.

Thus the property was, because of the allied victory, legally taken by the Allied Powers from Japan and title restored under a directive of the Supreme Commander for the Allied Powers.

It is to be noted at this point that all action taken was by the Supreme Commander for the Allied Powers, not by the United States. As was said in Anglo-Chinese Shipping Company, Ltd. v. United States, 127 F.Supp. 553, 554, 130 Ct. Cl. 361, 362:

"* * * The occupation of Japan was a joint venture, participated in by the United States of America, the United Kingdom, China, and Russia; * * *."

This leaves no doubt but that occupation of plaintiff's properties was not an act by the United States but by the Allied Powers. There was no taking by the United States and thus the Government is not liable under the fifth amendment. See Koki Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 1238, 93 L.Ed. 1902; Flick v. Johnson, 85 U.S.App.D.C. 70, 174 F.2d 983.

To hold otherwise would be to open the door to claims of not only citizens but noncitizens alike for all occupancy by the Allied Powers, thus causing the United States to bear almost the entire financial burden, not only of the war but also of

the peace. This we are not prepared to do.

The unfortunate circumstances of war very often lead not only to human misery but to financial loss as well. It is unfortunate that plaintiff has received no compensation for the occupancy of the properties in question,[1] but on the other hand perhaps it is fortunate that plaintiff's property was preserved and protected by the Allied Powers' occupancy.

There being no fifth amendment taking by the United States, plaintiff's petition is dismissed.

It is so ordered.

LITTLETON, Judge, concurs.

MADDEN, Judge.

■■ When a defeated country is occupied, the victor has the right to impose upon the government of the defeated country the burden of housing the occupying troops. This would be true whether the occupation was that of a joint force, or by the forces of a single victorious nation. In the instant case the Supreme Commander for the Allied Powers exercised this right by issuing his directive to the Japanese Government. It then became the duty of the Japanese Government to make available to the occupying forces such housing as they selected and needed.

The Japanese Government had the duty to exercise its sovereign power to obtain the housing to comply with the directive of the Supreme Commander. It was not acting as an agent of the Supreme Commander, authorized and directed by him to secure housing for his troops at his nation's expense. It was fulfilling its own obligation as a defeated and occupied sovereign. How it obtained the housing needed to fulfill that obligation was its own problem, governed by its own law. If its law was like our law, including our Fifth Amendment, it would have to pay for what it took for this public purpose, i. e. for fulfilling its obligation as an occupied nation.

Japanese sovereignty, including its power to requisition property for a public purpose, extended, of course, to all the property within its territory, whether the private ownership of that property was in Japanese, British, Dutch, American, or any other citizens. In the instant case, the property selected by the occupying forces and requisitioned by the Japanese Government happened to belong to an American citizen. That fact would seem to be completely immaterial. The important thing was that the property was taken by the Japanese Government for the purposes of that government. There was, then, no taking by the United States. There was use by United States forces, or allied forces, of housing furnished to them by Japan.

It seems that the Japanese Government, under its laws, which laws may have been dictated by the Supreme Commander, or may have been the existing laws of Japan, did pay rent for housing which it took from private persons in order to furnish it to the occupying forces. It tendered such rent to the plaintiff, at the rate which was legal under the laws of Japan. That is all that a Japanese or a Britisher or a Dutchman would have been entitled to and that is all that the plaintiff, an American, was entitled to, for its property in Japan and subject to Japanese laws. The plaintiff refused the tender. It made a mistake in doing so. Whether, under Japanese laws, the money is still available to it we do not know. That is a problem for it and the Japanese Government. Plaintiff's petition must be dismissed.

JONES, Chief Judge, joins in the foregoing opinion.

WHITAKER, Judge (dissenting).

I cannot agree with the opinions of the majority. In the first place, I do not agree with the reason assigned by Judges

---

1. Plaintiff was, however, tendered the rent at the Japanese legal rate by Japan but refused to accept claiming it was not bound by the Japanese Rent Control Ordinance. Apparently Japan is willing to pay this amount today.

LARAMORE and LITTLETON for the nonliability of the United States to pay just compensation for the occupation of plaintiff's property, to wit, that it was an occupation not by the United States, but by the Allied Powers:

The occupation of Japan was a joint enterprise of the United States, Great Britain, Russia and other Powers, but each Power was liable for the expense of the maintenance of its own forces. Food and clothing were purchased by the United States for its troops, by Great Britain for its troops, etc. Liability for these purchases was on the Government making them, and on it alone. The cost of quartering its troops was also the responsibility of the several Governments. That each of them was engaged in a joint venture with the others affords no escape from liability. See Anglo Chinese Shipping Co. v. United States, 127 F.Supp. 553, 130 Ct.Cl. 361.

However, there is in my mind a serious question of the liability of the United States on another ground. After the outbreak of war with Japan, plaintiff's property, located in Japan, was, under international law, enemy property, and during hostilities, at least, was liable to utilization, or even to destruction, by our forces with impunity; the owner had no redress against the United States therefor. Juragua Iron Co., Ltd. v. United States, 42 Ct.Cl. 99, affirmed 212 U.S. 297, 29 S. Ct. 385, 53 L.Ed. 520; Herrera v. United States, 222 U.S. 558, 32 S.Ct. 179, 56 L.Ed. 316; Oppenheim, International Law (6th Ed.) Vol. II, section 140; Wheaton International Law (7th Ed.) p. 248; Hyde, International Law (2d Rev. Ed.) Vol. III, pp. 1726–1731.

Does this rule apply to the property of a citizen of the United States, or a corporation of the United States, after the formal surrender of the enemy?

Technically, of course, the war is not over until the treaty of peace is signed, and occupation forces are a necessary aftermath of the surrender. Also, it will not be disputed that during the period of occupation our Government could require the use of the property of a Jap-anese national; and that national would have no recourse against it. But does this same rule apply to the property of an American citizen or an American corporation after the enemy has surrendered? After the surrender, is the property of an American citizen still enemy property?

The war was fought for the protection of American lives and property, for the protection of this property as well as other property of our citizens; it was fought to secure restoration of American property that had been seized by the enemy. This purpose was partly accomplished by the order of the Supreme Commander requiring the restoration of the property seized by the Japanese Government. The Japanese Government restored title to it, and would have restored possession except for its occupancy by the American Army. From that time on, Japanese sovereignty over this property was ended; its dominion and control over it was surrendered and the title of its former owner was recognized.

Thereafter, this property could not in reason be classified as enemy property. It was the property of an American corporation, which had been liberated from the hands of the Japanese.

Now, the right of the American Army of Occupation to use it in furtherance of the purposes of the occupation is not open to question; but when so used, it was used, not as enemy property, but as the property of an American corporation. Its owner was entitled to the same recompense as the owner of other property taken by the Government for public purposes, to wit, the payment of just compensation.

The United States had the right, as the victor, to require the conquered enemy to pay the cost of occupation, including the rental value of plaintiff's property; but this does not mean that the United States can shift to Japan's shoulders the responsibility the United States is under to one of its own citizens for the taking of its property. It must compensate the citizen itself, and then look

to Japan for restitution. Seery v. United States, 127 F.Supp. 601, 130 Ct.Cl. 481.

I think the plaintiff is entitled to recover the fair rental value of the property from the time title to it was restored to plaintiff by the Japanese Government, and until possession of it was restored to plaintiff by the United States Government.

I would remand the case to a Commissioner to determine this amount.