Minniah MELONG et al., Appellants,

v.

MICRONESIAN CLAIMS COMMISSION, an Agency of the United States, et al.

No. 76–1201.

United States Court of Appeals, District of Columbia Circuit.

Submitted Without Argument Feb. 7, 1977.

Decided March 29, 1977.

Rehearing Denied Sept. 12, 1977.

Richard A. Frank, Leonard C. Meeker, Eldon V. C. Greenberg, Washington, D.C., and Ann E. Allen, Saipan Islands, Mariana Islands, were on the brief for appellants.

Rex E. Lee, Asst. Atty. Gen., Civ. Div., Dept. of Justice, Earl J. Silbert, U.S. Atty., Ronald R. Glancz and Barbara L. Herwig, Attys., Civ. Div., Dept. of Justice, Washington, D.C., were on the brief for appellees.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

■ Appellants brought suit in the District Court challenging the standard by which the Micronesian Claims Commission determined the amounts of awards made to them[1] under the Micronesian Claims Act of 1971.[2] The District Court dismissed the action[3] on the ground that review was precluded by the Act.[4] In *Ralpho v. Bell*,[5] decided today, we found some limited scope for review of activities of the Commission,[6] and since this case, unlike Ralpho's, presents no question beyond our authority to resolve,[7] we have exercised our function fully. We find that the Commission's measure of recovery contravenes the statute of which it is a creature. We accordingly remand the case to the end that the challenged awards will be vacated by the District Court and redetermined by the Commission.

**I**

Melong Laitak died as a result of the conflict in Micronesia between the United States and Japan during World War II. When, over 25 years later, the Commission was established to deal with claims of loss arising from those hostilities,[8] his survivors, appellants here,[9] filed a claim form, praying for recompense of $11,000.[10] On the basis of their filing, the Commission issued its first opinion allowing the claim but incorporating a strikingly different assessment of the appropriate award.[11] This initial decision acknowledged the Commission's statutory duty to resolve claims "in accordance with the laws of the Trust Territory of the Pacific Islands and international law,"[12] yet it eschewed reliance on either territorial or international wrongful-death recovery rules —which, like regulations applied in war-claims programs elsewhere in the Pacific theatre,[13] had as their goal compensation of survivors for "pecuniary damages sustained *by them*"[14] as a result of their loss. Those

---

1. This case was styled by appellants as a class action, but since the District Court dismissed without certifying a class, we must treat it as involving only the named plaintiffs. See *Board of School Comm'rs v. Jacobs*, 420 U.S. 128, 130, 95 S.Ct. 848, 850, 43 L.Ed.2d 74, 78 (1975). They are survivors either of Melong Laitak or Ukukot Libokmeto, Micronesians who were killed as a result of hostilities in Micronesia during World War II. The separate claims occasioned by their deaths are factually similar, and the legal contentions of the two claimant groups are for our purposes identical. For convenience's sake, we will refer only to the facts and proceedings devolving from the death of Melong Laitak.

2. Act of July 1, 1971, Pub.L. No. 92–39, 85 Stat. 92, as amended, 50 U.S.C.App. §§ 2018 *et seq.* (Supp. II 1972).

3. *Melong v. Micronesian Claims Comm'n*, Civ. No. 75–0462 (D.D.C. Nov. 25, 1975) (unreported), Appendix ("App.") 46–50.

4. See 50 U.S.C.App. § 2020 (Supp. II 1972).

5. 186 U.S.App.D.C. ——, 569 F.2d 607 (1977).

6. See *Ralpho v. Bell, supra* note 5, at Pts. II–A, II–B.

7. See *id.* at n.49.

8. For a brief treatment of the history of Micronesian claims see *id.* at notes 9–33 and accompanying text.

9. See note 1 *supra.*

10. See *Minniah Melong*, Claim No. 1090–J, Dec. No. 1 (final decision Dec. 12, 1973) (unreported) App. 22. At some point the survivors' request increased to $73,210. *Id.*

11. *Minniah Melong*, Claim No. 1090–J, Dec. No. 1 (initial decision Mar. 12, 1973) (unreported) App. 17.

12. 50 U.S.C.App. § 2019c(a) (Supp. II 1972).

13. *Minniah Melong* (initial decision), *supra* note 11, App. 18. The reference is to the Guamanian Claims Act. Act of Nov. 15, 1945, Pub.L. No. 79–224, 59 Stat. 582, 50 U.S.C.App. § 2004(h) (1970).

14. *Minniah Melong* (initial decision), *supra* note 11, App. 19, quoting 5 Hackworth, Digest of International Law 747 (1943) (emphasis in original). See note 32 *infra.* The Trust Territory's wrongful death statute, 6 T.T.C. § 202 (1970), was seen as valuing wrongful death recoveries by "the pecuniary benefits which the beneficiaries might reasonably be expected to have derived from the deceased had his life

compensatory standards, operable as they were on an evidentiary showing, were perceived as inconvenient because "memories have dimmed and documents are much more difficult, and sometimes impossible, to obtain." [15] Instead, the Commission devised a chart setting, for all cases, the quantum of recovery entirely by the decedent's age at death.[16] Using this chart and Melong's age of 27 at death, the Commission awarded his survivors $4,400.[17]

Melong's survivors then availed themselves of the mechanism for administrative reconsideration,[18] following which the Commission promulgated a final decision [19] cleaving to the measure of recovery it had previously elected but drastically revamp-

ing its reasoning. The keystone of its new rationale was the *ex gratia* denomination of payments under the Micronesian Claims Act,[20] for it read the congressional invocation of Trust Territory and international law [21] as directing it only to those laws pertaining to *ex gratia* war claims.[22] Territorial and international wrongful-death principles were dismissed as "clearly inapplicable" because rooted in culpability rather than charity.[23] Generalizing that "under international law, when no liability to compensate the survivors exists . . . an arbitrary payment may be made," the Commission related several instances in which *ex gratia* payments of flat sums had been

not been terminated." *Minniah Melong* (initial decision), *supra* note 11, App. 17, quoting *Ychitaro v. Lotius,* 3 T.T.R. 3, 17 (1965).

15. *Minniah Melong* (initial decision), *supra* note 11, App. 18.

16. *Id.,* App. 19. The amounts in the Commission's chart ranged from $500 for the very young and very old to a peak of $5,000 for decedents of 21 years. These amounts the Commission assertedly derived from "the potential earning capacity of a decedent and the potential of support which decedent's family may have been deprived." *Id.* Neither the formula for derivation nor the evidence on which the calculations were based has been adduced on the record by the agency. The range of awards, on the other hand, was arrived at by analogy to the sizes of awards made for war claims in nearby Guam pursuant to a program administered by the Navy under the Guamanian Claims Act, see note 13 *supra,* to which Congress had referred the Commission. See *Micronesia Economic Developments and Claims, Hearings on S. '860 and S.J.Res. 35 Before the Subcomm. on Territories and Insular Affairs of the Senate Comm. on Interior and Insular Affairs,* 92d Cong., 1st Sess. 54 (1971) ("*1971 Senate Hearings*"); *Micronesian Claims, Hearings on H.R.J.Res. 1161, 1258, 1265 Before the Subcomm. on Int'l Orgs. and Movements of the House Comm. on Foreign Affairs,* 91st Cong., 2d Sess. 4 (1970) ("*1970 House Hearings*"). The Guamanian awards had been determined on a compensatory basis, and the awards had apparently been between $1,000 and $4,000, *id.*; this number the Commissioner compared with the "average of less than $1,800 per death" in the related Ryukyan Islands claims program. See *Minniah Melong* (initial decision), *supra* note 11, App. 18. An upward adjustment in the range of awards was predicated by the Commission on the ground of

lapse of time between settlements in the Guamanian and Ryukyan programs and those in the Micronesian claims. *Id.* at 18–19.

17. *Id.,* App. 21.

18. They requested and received a hearing to contest matters both of fact and law, pursuant to 50 U.S.C.App. § 2019 (Supp. II 1972) and § 593 of the regulations thereunder. See the Commission's Regulations § 593, 1973 Foreign Claims Settlement Comm'n Annual Report, at 63–64 ("1973 FCSC Ann.Rep.").

19. *Supra* note 10.

20. 50 U.S.C.App. § 2019(a) (Supp. II 1972): It is the purpose of this title . . . that, with respect to war claims, the United States should make an ex gratia contribution . . matching an equivalent contribution of the Government of Japan, to Micronesian inhabitants of the Trust Territory . . . .
The statute incorporated in this regard the terms of the Agreement on the Trust Territory of the Pacific Islands, Apr. 18, 1969, United States-Japan, 20 U.S.T. 2654, T.I.A.S. No. 6724 ("Agreement on Trust Territory"). Black's Law Dictionary 660 (4th ed. 1957), defines ex gratia as "[o]ut of grace. . . . A term applied to anything accorded as a favor; as distinguished from that which may be demanded *ex debito* as a matter of right." See M. Whiteman, Damages in International Law 745–746 (1937); Freeman, Responsibility of States for Unlawful Acts of Their Armed Forces, 2 Recueil des Cours 268, 297 (1956).

21. See text *supra* at note 12.

22. *Minniah Melong* (final decision), *supra* note 10, App. 22.

23. *Id.*

made,[24] and suggested that recourse to an arbitrary rule in the instant case was "equitable and reasonable." [25] Examination of the claimants' evidence relating to damages was in its view "unnecessary"; all the Commission needed was the decedent's age at the last.[26]

## II

The Commission asks us to believe that Congress purported to bind it to the imperatives of international and local law in order merely to demonstrate the degree to which the Commission was unfettered by any legal norm, and so might act with impunity. Were anyone ever inclined to impute such queer behavior to a legislature, it could not be done here, for a ringing refuta-

tion of that view resounds from the legislature's very command.

The Act recites, to be sure, that its mission is *ex gratia* settlement of Micronesian war claims[27]—*ex gratia* because both the United States and Japan have historically denied any responsibility to satisfy them.[28] Just as assuredly, Congress intended the Commission to disregard questions of culpability under international law in deciding whether claims were to be allowed, and to debar no one simply because a nation's culpable involvement in a death could not be shown.[29] Yet the statute implicitly, and its legislative history positively require consideration and adjudication of claims to be otherwise "in accordance with" international law standards.[30] And international law, though it imposes liability for death caused by unlawful activities during hostilities,[31]

**24.** *Id.,* App. 23, citing 1 M. Whiteman, Damages and International Law 745 *et seq.* (1937).

**25.** *Minniah Melong* (final decision), *supra* note 10, App. 23.

**26.** *Id.*

**27.** 50 U.S.C.App. § 2019(a) (Supp. II 1972), quoted *supra* note 20.

**28.** See *Ralpho v. Bell, supra* note 5, at notes 14–20 *supra* and accompanying text.

**29.** "By the terms of the bill, the Commission is authorized to receive, examine, adjudicate, and render final decisions respecting Micronesian claims, in accordance with the laws of the Trust Territory of the Pacific Islands and international law. Under customary international law, civilians in a war zone . . . are not entitled as a matter of law to compensation for death or physical or property damage which results from the lawful conduct of hostilities. That rule is not intended to come into play in respect to these claims, which will be governed by the agreement with Japan and by this resolution. The purpose of compensating Micronesians for wartime claims is to meet their claims *whether they arose as a result of the lawful conduct of hostilities or otherwise.* Hence, payments are an ex gratia contribution to the Micronesians. No Micronesian claimant could be debarred on the ground that his or her claim fails to meet the tests of customary international law. A reference in the bill to international law is useful in furnishing guidance to the Commission on the measure of damages to be applied in meeting claims. . . ." H.R.Rep. No. 92–226, 92d Cong., 1st Sess. 4 (May 25, 1971) (emphasis added).

**30.** 50 U.S.C.App. § 2019c(a) (Supp. II 1972) provides that "[t]he Commission shall have authority to receive, examine, adjudicate, and render final decisions, *in accordance with the laws of the Trust Territory of the Pacific Islands and international law*" all claims under the Act (emphasis added). See text *supra* accompanying note 12 *supra.*

**31.** "The principle that, for injuries to or destruction of private property in necessary military operations . . . ., the government is not responsible, is thus considered established. Compensation has been made in several such cases, it is true; but it has generally been . . . 'a matter of bounty rather than of strict legal right.' " *Juragua Iron Co. v. United States,* 212 U.S. 297, 307, 29 S.Ct. 385, 388, 53 L.Ed. 520, 524 (1909), quoting *United States v. Pacific R.R. Co.,* 120 U.S. 227, 239, 7 S.Ct. 490, 495, 30 L.Ed. 634, 638 (1887). See Assistant Legal Adviser for International Claims, Letter of Sept. 17, 1957, quoted in 8 Whiteman, Digest of International Law 825 (1967) ("it is a generally accepted principle of international law that a state is not liable for losses and damages caused by military operations against opposing forces (such as shelling and bombing), unless they resulted from wanton acts or operations which were unnecessary from a military standpoint"). *Cf. United States v. Caltex, Inc.,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); *Herrera v. United States,* 222 U.S. 558, 32 S.Ct. 179, 56 L.Ed. 216 (1912); *Castro v. United States,* 500 F.2d 436, 440 (Ct.Cl.1974). See generally 5 G. Hackworth, Digest of International Law § 536 at 693–706 (1943); Freeman, Responsibility of States for Unlawful Acts of Their Armed Forces, 2 Recueil des Cours 263, 293–295 (1956). See also Hague Convention,

and prescribes therefor recovery equal to the pecuniary loss consequentially suffered by survivors,[32] assesses no liability whatever for death resulting from war lawfully conducted, and provides, of course, no "rule" at all for determining awards therefor. The Commission's *ex gratia* interpretation, with its built-in premise that neither the United States nor Japan contributed culpably to any Micronesian death, would permit blithe disregard of every measure of damages discoverable in international law, and charge it only to heed a nonexistent rule. Clearly no such outcome was contemplated by Congress, and its illogic is further manifested by its relegation to the whimsy of the Commission of even those whose claims might have satisfied the international law standard establishing liability.

 If this were not bad enough, the Commission's reading would wreak the same evisceration of the congressional invocation of territorial law as a constraint on the Commission. Trust Territory law gives compensatory damages for wrongful death [33] but, not surprisingly, embodies no principles regarding war. claims, much less guidelines for *ex gratia* awards deriving from deaths inflicted in derogation of no legal norm. Thus the Commission, by narrowing its perspective to encompass only *ex gratia* programs for Micronesians, would ignore territorial law as it is, and hypothesize rules of law that do not and never did exist

in the Trust Territory. Such a construction, leading as it does to patent absurdity, is obviously to be avoided.[34]

The Commission's argument cannot be supported on the ground of statutory ambiguity inherent in Congress' twin commands to pass over the normal international law inquiry into culpability but to act in all other respects in accordance with international and territorial law. Taken together, they unmistakably mean that "unlawful" deaths, like every other category of claims adjudicated by the Commission, are to be treated consonantly with those bodies of law, and if they are they will, as the Commission concedes,[35] spark recovery of such pecuniary damages as survivors are shown to have sustained. The direction to treat "lawful" and "unlawful" deaths identically [36] plainly commands consideration of both types of claims at the same rate and—compliably with international and Trust Territory law respecting "lawful" death—both on a compensatory basis.

Similarly, every indication in the legislative history points to determination of appropriate compensation for claimants' losses as they variously appear from case-by-case consideration. The Department of the Interior, under whose aegis the prototype bill was drafted, asserted that "even though it represents a most difficult task, the [death] claims will need to be *adjudicated* in terms of the values of the early 1940's." [37] The

---

July 29, 1899, art. XXIII(g), 32 Stat. 1817–1818, T.S. No. 403, quoted in Freeman, *supra*, at 305, prohibiting destruction or seizure of property "unless [it] be imperatively demanded by the necessities of war."

**32.** See *Minniah Melong* (final decision), *supra* note 10, App. 22. *Cf.* Grotius, De Jure Belli Ac Pacis Libri Tres, quoted in 8 M. Whiteman, Digest of International Law 897 (1967): "He is, furthermore, *bound to give to* [dependents] *so much as* [the] expectation of support was worth. . . ." See also *id.* at 900; 5 Hackworth, Digest of International Law § 539 at 747 (1943).

**33.** See note 14 *supra*.

**34.** See, *e. g., United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513, 520, 99 L.Ed. 615, 624 (1955); *McDonald v. Thompson*, 305

U.S. 263, 266, 59 S.Ct. 176, 178, 83 L.Ed. 164, 166 (1938); *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704, 708 (1932).

**35.** *Minniah Melong* (initial decision), *supra* note 11, App. 17, 19; *Minniah Melong* (final decision), *supra* note 10, App. 22.

**36.** See note 29 *supra*.

**37.** *1971 Senate Hearings, supra* note 16, at 54 (letter of Under Sec'y of Interior Russell (emphasis supplied); S.Rep. No. 91–1278, 91st Cong., 2d Sess. 8 (Oct. 5, 1970) (letter of Sec'y of Interior Hickel); *1970 House Hearings, supra* note 16, at 4 (same).

man who negotiated the treaty[38] that the Act sought to effectuate used Trust Territory *wrongful death* awards as indices of recoveries realizable under the Act,[39] and agreed with the Department that the Commission would need to compute recoveries in terms of wartime conditions in Micronesia.[40] Some controversy centered around the figures he adduced,[41] but no one suggested that the compensatory principles couched in Trust Territory wrongful-death awards were to be disregarded. And there was general and explicit agreement that the Micronesian awards were to be guided by war-claims awards in Guam,[42] which again were founded on compensatory principles.[43]

Against this backdrop, the Commission's effort to render meaningless the directional signals provided by Congress strikes us as an abdication of its appointed role as the trier of fact in these claims proceedings as well as a clear violation of statute. One notes, moreover, that cases involving death claims by Micronesians against the United States between the end of hostilities and the return to civil government[44]—which are adjudicated by the Commission under the same Act[45]—are valued by the Commission on the basis of "evidence of pecuniary loss . . ., the age of the decedent and any history of earning capacity."[46] In light of that determination, and the Commission's acceptance of the necessity of adducing testimony and determining compensatory value in other sorts of cases,[47] its failure to do so in death cases all the more clearly represents a departure from statute as well as from practice.

■ The scope of judicial review of Commission action is, as we caution in *Ralpho*,[48] very limited. Yet, as we hold in *Ralpho*, it extends to correction of violations of clear, statutory mandates.[49] In the instant case, we find the unmistakable directive of the statute to be that the Commission utilize the indices of damages available in international and Trust Territory law. Congress obviously intended that the Commission get guidance where guidance was to be gotten, and this the Commission plainly has not done. Instead, it has asserted license completely to disregard every measure of death-damages enshrined in either of these vital sources of law.

This we cannot sustain.[50] We accordingly remand the case to the District Court

---

**38.** See note 20 *supra.*

**39.** *Micronesian Claims Act of 1971 Hearings on H.R.J.Res. 521 Before the Subcomm. on Int'l Orgs. and Movements of the House Comm. on Foreign Affairs,* 92d Cong., 1st Sess. 97 (1971) ("*1971 House Hearings*"); *1970 House Hearings, supra* note 16, at 26.

**40.** *1970 House Hearings, supra* note 16, at 70.

**41.** Compare *1971 House Hearings, supra* note 39, at 97, with *1970 House Hearings, supra* note 16, at 62, 67.

**42.** See note 16 *supra.*

**43.** See note 16 *supra.*

**44.** The Micronesian claims were divided by Congress into two categories: "(1) claims . . . directly resulting from the hostilities between the Governments of Japan and the United States between December 7, 1941, and the dates of the securing of the various islands of Micronesia by the United States Armed Forces, and (2) those claims arising as postwar claims between the dates of the securing of the various islands . . . and July 1, 1951." 50 U.S.C.App. § 2019c(a) (Supp. II 1972).

**45.** 50 U.S.C.App. § 2020 (Supp. II 1972).

**46.** Brief for Appellants at 7–8 n.3.

**47.** See 1973 FCSC Ann.Rep., *supra* note 18, at 43, 98, quoting *Lomo Jib,* Claim No. 2754–J, Dec. No. 26 (July 6, 1973) (loss of property); *id.* at 47, 99–100 (temporary appropriation of real property compensable at rental value). See also *Ralpho v. Bell, supra* note 5, at note 40. But see 1973 FCSC Ann.Rep., *supra* note 18, at 44, 99–100 (forced labor compensable at "average wage in effect" during period); *id.* at 49, 120–121 (crop loss compensable at percentage of "value of the average mix of crops that could be expected").

**48.** *Ralpho v. Bell, supra* note 5, at Pts. II–A, II–B.

**49.** *Supra* note 5.

**50.** Given our disposition of the statutory issue raised by appellants, we do not reach their constitutional claim, namely that the Commission's measure of damages was so arbitrary as to violate substantive due process. *Cf. Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

with instruction to vacate the awards in question and direct the Commission to re-determine them in a manner not inconsistent with this opinion.

*So ordered.*