Peelle, Ch. J.,
delivered the opinion of the court:
This action is founded on a claim for the use and damage. for the detention of the steamship San Juan, owned by Spanish subjects, captured in the port of Santiago, Cuba, during the war with Spain, July, 1898. The seizure was by the army, and no question of prize is involved. -
But for the averment in the petition that the vessel herein was taken possession of by the United States “ as private property and without any claim of title by reason of capture, or confiscation, or forfeiture,” -and used for lawful governmental purposes, the question of the liability of the United States might perhaps have been determined under rules 37 and 92 before either party had incurred expense in the taking of testimony.
*436 This case is ruled by that of Hijo v. The United States (194 U. S. R., 316, 320), unless excepted therefrom by reason of the relation of the United States to Cuba. That case, like the one here, was for the capture, use, and damage for detention of a vessel, owned by Spanish subjects, in the port of Ponce, P. R., at the time of the capture and surrender of that port and city in July, 1898, to the naval and military forces of the United States.
There, as here, the vessel was used or detained by the military forces under the orders of the Quartermaster’s Department of the army until April, 1899, when the vessel, as here, was returned to the owners on condition that all claims for use or damage for detention should be waived, which was done.
In each case the vessel captured was owned by Spanish subjects, and the capture, use, and detention of the vessel occurred during the war with Spain, which war, says the court in the case cited, “ did not in law cease until the ratification in April, 1899, of the treaty of peace.”
In that case the contention was that the claim arose out of an implied contract, and that an action could be maintained thereon under section 1 of the act of March 3, 1887, commonly known as the Tucker Act. (24 Stat. L., 505.) But in response to that contention the court, by Mr. Justice Harlan, said:
“ The present suit finds no sanction in the above act, even if the plaintiff were not a foreign corporation. Its claim is not founded on the Constitution of the United States, or on any act of Congress, or on any regulation of an executive department. Nor can it be said to be founded on contract, express or implied. There is no element of contract in the case, for nothing was done by the United States, nor anything said by any of its officers, from which could be implied an agreement or obligation to pay for the use of the plaintiff’s vessel. According to the established principles of public law, the owners of .the vessel, being Spanish subjects, were to be deemed enemies, although not directly connected with military operations. The vessel was therefore to be deemed enemy’s property. It was seized as property of that kind, for purposes of war, and not for any purposes of gain. * * * The seizure, which occurred while the war was flagrant, was an act of war occurring within the *437 limits of military operations. The action, in its essence, is for the recovery of damages, but, as the case is one sounding in tort, no suit for damages can be maintained under the statutes against the United States. It is none the less a case sounding in tort because the claim is in form for the use of the vessel after actual hostilities were suspended by the protocol of August 12, 1898. A state of war did not in law cease until the ratification in April, 1899, of the treaty of peace. ‘A truce or suspension of armies,’ says Kent, £ does not terminate the war, but it is one of the commercia belli which suspends its operations. * * * At the expiration of the truce hostilities may recommence without any fresh declaration of war.’ (1 Kent, 159, 161.) If the original seizure made a case sounding in tort, as it undoubtedly did, the transaction was not converted into one of implied contract because of the retention and use of the vessel pending negotiations for a treaty of peace. Besides, the treaty of peace between the two countries provided that ‘ the United States and Spain mutually relinquish all claims for indemnity, national and individual, of every kind, of either Government, or of its citizens or subjects, against the other Government, that may have arisen since the beginning of the late insurrection in Cuba and prior to the exchange of ratifications of the present treaty, including all claims for indemnity for the cost of the war. The United States will adjudicate and settle all claims of its citizens against Spain relinquished in this article.’ This stipulation clearly embraces the claim of the plaintiff — its claim against the United States for indemnity having arisen prior to the exchange of ratifications of the treaty of peace with Spain.
“We may add that even if the act of March, 1887, standing alone, could be construed as authorizing a suit of this kind, the plaintiff must fail, for it is well settled that in case of a conflict between an act of Congress and a treaty— each being equally the supreme law of the land — the one last in date must prevail in the courts. (The Cherokee Tobacco, 11 Wall., 616, 621; Whitney v. Robertson, 124 U. S., 190, 194; United States v. Lee Yen Tai, 185 U. S., 213, 221.)”
We have thus quoted from that case at length because the ruling and language in that case cover the present case completely, unless excepted therefrom by reason of the peculiar relation of the United States to Cuba, and as to that let us now inquire.
It must be borne in mind that at the time of the capture and use of the vessel in question Cuba was under the do *438 minion and sovereignty of Spain, and so remained until relinquished by the terms of the treaty of Paris, when, on December 13, 1898, the United States, pursuant to the terms of that treaty, entered into the occupancy of said island and established therein a military government and maintained the same under the direction of the President as Commander in Chief of the Army and Navy of the United States until May, 1902, when the government and control of the island was transferred to the President and Congress of the Republic of Cuba.
Even if it should be conceded that the surrender of the port and city of Santiago to the military and naval forces of the United States in July, 1898, carried with it the sovereignty of the United States over that particular district, still by the protocol of August 12, 1898, the United States in effect conceded the sovereignty of Spain over the island. The protocol — a basis for the establishment of peace — which in terms suspended hostilities between the two countries, did not operate either to suspend or terminate the sovereignty of Spain over Cuba. By Article Y thereof provision was made for the appointment of commissioners to meet at Paris not later than October 1, 1898, to treat of peace; and it was not until by Article I of the treaty of Paris of December 10, 1898, that Spain relinquished “ all claim of sovereignty over and title to Cuba.” Hence the United States thereby recognized the sovereignty and authority of Spain over Cuba until terminated by the treaty; and though for some purposes the military authorities of the United States had prior thereto exercised dominion over particular parts of the territory acquired by conquest, the island nevertheless was foreign territory, held in trust by the United States for the inhabitants thereof. The conquest was not with the intention of holding or taking title to the island or any part thereof, as had previously been declared by the joint resolution of Congress.
In other words, “ during the continuance of the war, the conqueror in possession has only a usufructary right, and the latent title of the former sovereign continues, until the treaty of peace, by its silent operations, or express provisions, ex *439 tinguishes bis title forever ” (sec. 545 Wheaton’s International Law and authorities there cited). Here, while by the treaty the sovereignty of Spain was relinquished, it was not transferred to the United States, so that the authority of the United States over the island or any district thereof was, as expressed in said joint resolution, only “ for the pacification thereof.”
In the case of Neely v. Henkel (180 U. S., 109, 120) the court, after reviewing the objects intended to be accomplished by the war with Spain and the military occupation thereof as disclosed by public acts and official documents, said:
“ Cuba is none the less foreign territory, within the meaning of the act of Congress, because it is under a military governor appointed by and representing the President in the work of assisting the inhabitants of that island to establish a government of their own, under which, as a free and independent people, they may control their own affairs without interference by other nations. The occupancy of the island by troops of the United States was the necessary result of the war. That result could not have been avoided by the United States consistently with the principles of international law or with its obligations to the people of Cuba.
“ It is true that as between Spain and the United States— indeed, as between the United States and all foreign nations— Cuba, upon the cessation of hostilities with Spain and after the treaty of Paris, was to be treated as if it were conquered territory. But as between the United States and Cuba that island is territory held in trust for the inhabitants of Cuba, to whom it rightfully belongs and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action.”
But the contention of the claimants is that their action is based on the executive order of the President of July 13, 1898, which was promulgated by the Secretary of War in General Order No. 101, July 18,1898, providing, among other things, as follows:
“Private property, whether belonging to individuals or corporations, is to be respected, and can be confiscated only for cause. Means of transportation, such as telegraph lines and cables, railway, and boats, may, although they belong to private individuals or corporations, be seized by the military occupant, but unless destroyed under military necessity are not to be retained. * * *
*440 “ Private property taken for the use of the army is to be paid for, when possible, in cash at a fair valuation; and when payment in cash is not possible receipts are to be given.”
The contention is that the order of the President so promulgated is a regulation of the War Department, and that, therefore, they are entitled to maintain their action thereon under section 1, act of 1887. But this question, we think, is fully met by the ruling in the case of Hijo v. The United States, supra—that is to say, “the seizure, which occurred while the war was flagrant, was an act of war occurring within the limits of military operations. The action, in its essence, is for the recovery of damages, but as the case is one sounding in tort, no suit for damages can be maintained under the statute against the United States. It is none the less a case sounding in tort because the claim is in form for the use of the vessel after actual hostilities were suspended by the protocol of August 12, 1898.” And this, we think, applies with equal force to Cuba as to Porto Rico, as the vessel captured was owned by Spanish subjects, natives of Spain, residing in Cuba. Native Spaniards who were Spanish subjects residing in Cuba during said war were enemies, and their property was entitled to no more protection from the United States than other Spanish subjects, and particularly when, as in the present case, the vessel prior to its capture had been used in transporting Spanish troops, munitions of war, and supplies for the Spanish troops from place to place.
While the military and naval forces of the United States were enjoined by the executive order to respect “ private property, whether belonging to individuals or corporations,” it also authorized the confiscation of such property for cause. Besides, the same order authorized the seizure, by the military occupant, of the means of transportation, including “telegraph lines and cables, railways and boats,” although such property belonged to private individuals or corporations. True, when so seized the order directed the return of such property “ unless destroyed under military necessity.”
The Government, in the present case, elected to return the vessel instead of destroying it, but the return thereof is an *441 argument in favor of the generosity of the Government and not a confession that the seizure was not an act of war.
But it is contended that the joint resolution of Congress respecting the independence of the people of Cuba and the relinquishment of Spanish authority in the island, coupled with the disclaimer on the part of the United States to exercise sovereignty, jurisdiction, or control over said island— other than for the pacification thereof — operated to constitute the people of Cuba an ally to force Spain to relinquish her authority and control in said island, thereby segregating from Spanish territory as enemy’s country said island.
And from official documents as well as from the history of the time, of which the court takes judicial notice, the insurrectionists in said island against the Government of Spain did cooperate with the military forces of the United States in liberating Cuba from Spanish control. But the island was nevertheless under the sovereignty and control of Spain during the capture and use of the vessel in question, which capture and use were held by the executive department of the Government as a military necessity arising in the belligerent prosecution of the war, and for that reason the department denied to the claimants herein any compensation therefor.
What the United States did to establish and maintain the freedom and independence of Cuba was voluntarily undertaken and done; and in the execution of the purpose of the joint resolutions it was the judgment of the President, charged therewith, that the capture of the vessel and its use for the military and humane purposes set forth in the findings were for purposes of war and not for gain. In this view of the case individual rights must give way to the rights of the people of Cuba, for whose independence the United States intervened and for whose benefit the island was later held in trust.
But if we should assume that because of the acts of the United States the island was not enemy’s country and the claimants, by reason of their residence in Cuba, were not enemies, still the court would be confronted with Article YII of the treaty of Paris, which provided that “the United States and Spain mutually relinquish all claims for indemnity, national and individual, of every kind, of either Gov- *442 eminent, or of its citizens or subjects, against tbe other Government, that may have arisen since the beginning of the late insurrection in Cuba and prior to the exchange of ratifications of the present treaty, including all claims for indemnity for the cost of the war.”
The claimants herein were not only Spanish subjects, but were natives of Spain, so that whatever claim may have accrued to them against the United States during said war was relinquished in the treaty by the act of Spain.
Nor do we deem it material in the present case to consider the difference between native Cubans as subjects of Spain and natives of Spain who were subjects thereof residing in Cuba, for it is clear that whatever claim the subjects of •Spain had against the United States from the date of the insurrection in Cuba to the date of the exchange of ratifications of the treaty were relinquished; and while the United States by Article VII of the treaty agreed to “ adjudicate and settle the claims of its citizens against Spain,” thereby protecting Spain against the claims of any citizen of the United States, Spain did not obligate itself by the treaty to pay the claims of her subjects against the United States which she had relinquished; but we do not see that this is material or that it in any way strengthens the claimants’ right to recover for the use or damages for the detention of their vessel. By the act of Spain the United States were released from the payment of such claims, and they can not now be asserted against the United States.
True, within the time prescribed by Article IX of the treaty the claimants renounced their allegiance to Spain, and thereby adopted the nationality of Cuba; but that was long after the capture, use, and detention of the vessel and after the return thereof to the claimants, as set forth in the findings.
We deem it unnecessary to enter upon a discussion of the circumstances under which the vessel was restored to the claimants further than to say that no right to recover for the use and detention of the vessel can be predicated on the action of the War Department in requiring the claimants to accept the return of their vessel under the circumstances of this case, for even if the claimants had been permitted to receive *443 the vessel under protest, reserving in the receipt in express terms their right to prosecute a claim for the use and detention of the vessel, it would have availed them nothing, as there was no element of contract either in the capture, use, or detention of the vessel, nor was anything said by the officers of the Government from which there could be implied an agreement or obligation to pay therefor, and the claim being one sounding in tort no action will lie thereon against the United States on the order of the President.
For these reasons the numerous cases cited by the claimants, to the effect that where the Government appropriates private property which it does not claim as its own it does so under an implied contract to pay therefor, have no application in this case. Nor has the case of the Philippine Sugar Estates Development Company (40 C. Cls. R., 33), for the reason that at the time of the taking of the property in that case war with Spain had ceased; the Philippine Islands had been ceded to and were under the control and dominion of the United States; the country had been reduced to subjection before the taking of the property, and hence it was held that an implied contract arose to pay for the property so taken. But that is not the case here, as the capture and use of the vessel were both during the war with Spain, and even before the occupation of Cuba by the military forces of the United States.
Although we have reached the conclusion that the case of Hijo v. The United States, supra, is controlling in the present case, notwithstanding the peculiar relation of the United States to Cuba, we have found the facts on the merits of the case for the reason that in the case just cited the court, in concluding its opinion, said: “ We may add that even if the act of March, 1887, standing alone, could be construed as authorizing a suit of this kind, the plaintiff must fail, for it is well settled that in case of a conflict between an act of Congress and a treaty — each being equally the supreme law of the land — the one last in date must prevail in the courts.” So that if, in case of appeal, the Supreme Court should differ with this court and hold that an action could be maintained under the act of March, 1887, they would then have before *444 them the question whether the treaty, as in that case, operated to relinquish the claim herein.
For the reasons we have given we must hold that the court is without jurisdiction; and we may add that if we should take jurisdiction we should feel constrained under the wording of the treaty to apply it in this case, so that in either event the claimants must fail; and for that reason their petition is dismissed.