**GMO. NIEHAUS & CO. et al.**
v.
**The UNITED STATES.**
No. 501–56.

United States Court of Claims.
March 17, 1967.

Philip W. Amram, Washington, D. C., attorney of record, for plaintiffs. Amram, Hahn & Sundlun, Washington, D. C., of counsel.

Bruno A. Ristau, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM: *

### I

The plaintiffs in this action seek to recover compensation for the vesting by the Attorney General of the United States on July 26, 1951, under the Trading With the Enemy Act, as amended (50 U.S.C. App. §§ 1–40 (1946)), of $76,535.83 in cash and also negotiable securities having a market value of more than $500,000 on the date mentioned. At the time of the vesting, the cash and securities in question were on deposit with the National City Bank and the Chase National Bank of New York City, which held the assets in accounts maintained under the name of Gmo. Niehaus & Co., a Costa Rican business enterprise.

Subsequent to the vesting, the plaintiffs filed administrative claims with the Attorney General for the return of the property seized pursuant to the vesting order, but such claims were rejected.

The original plaintiffs in the present action were Gmo. Niehaus & Co., the Costa Rican company referred to in the first paragraph of this opinion, and five

natural persons, Imke Steinhoff, Kurt Niehaus, Gertrude Boese, Franz Laue, and Horst Laue, all of whom were residents of Germany. Kurt Niehaus died on May 5, 1963, after the institution of the present litigation. He was survived by his widow, Thea Niehaus, and by a son, Hans Joachim Niehaus, who were the successors in interest of Kurt Niehaus under the laws of Germany and who were substituted for him as plaintiffs in the present action. (Subsequent references in the opinion to the "German plaintiffs" will mean the five natural persons who originally sued as plaintiffs, including Kurt Niehaus, now deceased.)

The petition was filed on November 30, 1956. The defendant sought to secure the dismissal of the petition, first by means of a motion to dismiss and later by means of a motion for summary judgment. The first motion was denied by the court on July 12, 1957 (153 F. Supp. 428, 139 Ct.Cl. 605), and the second motion was denied on February 11, 1959 (170 F.Supp. 419, 145 Ct.Cl. 173). Thereafter, evidence was received, and the case is now ready for consideration by the court on the merits.

The vesting order of July 26, 1951, was based upon findings to the effect that the vested property was "property within the United States owned or controlled by, payable or deliverable to, held on behalf of or on account of, or owing to, * * * Kurt Niehaus, Imke Steinhoff, Gertrude Bose [sic], Franz Bose [sic], and Horst Bose [sic]," and that the persons named were "residents of Germany and nationals of a designated enemy country (Germany)."

It was alleged in paragraphs IV, V, and VI of the petition that the German plaintiffs did not acquire their interests in the property covered by the vesting order until sometime after January 1, 1947; and that on and prior to January 1, 1947, the Costa Rican plaintiff, Gmo. Niehaus & Co., "was the absolute owner

---

* Parts I, IIA, and most of IV of this opinion incorporate, with slight changes, the opinion prepared by Commissioner

Mastin G. White, at the direction of the court, under Rule 57(a).

of all legal and equitable right, title and interest in and to" the property subsequently covered by the vesting order. These allegations were denied by the defendant in the answer.

In its previous consideration of the case, this court indicated that if the German plaintiffs could sustain the allegations in the petition to the effect that their interests in the vested property were not acquired by them until sometime after January 1, 1947, they would be entitled to recover, since the court was of the opinion that the vesting power of the Attorney General did not extend to property in the United States acquired by German residents after December 31, 1946 (153 F.Supp. 428, 139 Ct.Cl. at pages 611–612; 170 F.Supp. 419, 145 Ct.Cl. at pages 176–177).

Therefore, it is crucial to determine when the German plaintiffs acquired their interests in the vested property. For a proper understanding of this issue, it will be necessary to make a rather lengthy statement concerning the background material.

The German plaintiffs are descendants of Wilhelm Niehaus, who was born in Germany on August 12, 1873. In 1891, when Wilhelm Niehaus was a boy of 17, he emigrated to Costa Rica, and established himself in that country. In 1897 or 1898, Wilhelm Niehaus traveled from Costa Rica to Germany, where he was married. He then returned to Costa Rica. Between 1899 and 1916, six children were born in Costa Rica to Wilhelm Niehaus and his wife. Wilhelm Niehaus was naturalized as a Costa Rican citizen on October 29, 1917.

In 1919, Wilhelm Niehaus moved from Costa Rica to Germany with his wife and children, and settled in Bremen. In 1920, he was appointed by the Government of Costa Rica as honorary consul in Bremen. Thereafter, he continued in charge of this consulate office, at least until World War II disrupted and later severed relations between Costa Rica and Germany. His wife died in 1931. In 1936, at the age of 63, Wilhelm Nie-haus suffered a very serious heart attack, from which he recovered. Some 10 years later, he died in Bremen on November 18, 1946.

Three of the sons of Wilhelm Niehaus and his wife—Willie (the oldest child), Hans (the fourth child), and Walter (the fifth child)—returned to Costa Rica from Germany on attaining maturity. These three members of the family were native-born citizens of Costa Rica; they never acquired German citizenship; and they were residents of Costa Rica at all times pertinent to this litigation.

The other children of Wilhelm Niehaus and his wife—Gertrude (the second child), Kurt (the third child), and Imke (the youngest child)—were residents and citizens of Germany at all times pertinent to this litigation. Gertrude was first married to a man named Laue, by whom she had two children, Franz Laue and Horst Laue. She was divorced from her first husband in 1933, and then married Herman Boese, of Bremen, Germany, in 1934. Imke first married a man named Mann in 1944. She presumably acquired the name Steinhoff by another marriage.

Therefore, the German plaintiffs are three of the children (Gertrude Boese, Kurt Niehaus, and Imke Steinhoff) and two grandchildren (Franz Laue and Horst Laue) of Wilhelm Niehaus.

Soon after Wilhelm Niehaus became a resident of Costa Rica as an immigrant boy of 17 in 1891, he started in business as the proprietor of a small store. Later, he entered farming, and built up an agricultural empire in cocoa, sugar, coffee, and cattle. He ran the business as a sole proprietorship until 1925. During the period prior to 1925, he adopted the policy of diversifying the enterprise's surplus profits and accumulated funds, leaving some in Costa Rica and investing some in both guilder and dollar securities through the deBary Bank in Amsterdam, Holland.

Effective as of January 12, 1925, Wilhelm Niehaus organized Gmo. Niehaus & Co. in Costa Rica as a "sociedad en

comandita por acciones."[1] This is a form of business enterprise unknown to the law of the United States. It is a full legal entity with shareholders, and is a juridical person separate and apart from its shareholders. One or more shareholders, however, must assume the same unlimited liability as a partner in a partnership. The liability of the remaining shareholders is similar to that of shareholders in an ordinary corporation, and is limited to their respective shares in the investment. (For the sake of convenience, Gmo. Niehaus & Co. will usually be referred to hereafter in the opinion as "the company.")

On organizing the company, Wilhelm Niehaus transferred to it the assets of his agricultural, industrial, and commercial businesses, including the reserve assets in the account with the deBary Bank, in exchange for 2,997 out of the 3,000 authorized shares of the company. Wilhelm Niehaus became the company's stockholder of unlimited liability, and also the manager (gerente) and president of the company, which posts he held until his death in 1946.

It has been mentioned previously that Wilhelm Niehaus moved from Costa Rica to Germany in 1919, and that thereafter he was a resident of Germany until his death in 1946. However, from 1919 until his heart attack in 1936, it was his custom to travel from Germany to Costa Rica about every two years, and to spend approximately six months in Costa Rica on each such visit. Despite his absence from Costa Rica during the greater part of the time after 1919, Wilhelm Niehaus maintained control over the company and made the important decisions for the company until the outbreak of World War II. As an example of his important role in the company's affairs, Wilhelm Niehaus selected in Germany the persons who were to be employed for the more responsible positions with the company in Costa Rica.

Upon returning to Costa Rica from Germany as young men, Willie and Hans Niehaus became employees of the company. Walter Niehaus was not employed by the company itself when he returned to Costa Rica from Germany, but he began to work for a subsidiary in which the company had a one-half interest.

When Willie and Hans Niehaus first began to work for the company, a Swiss citizen by the name of Pablo Ziegler Sacher, now deceased, was the senior executive of the company in Costa Rica. He had been with the company for many years. Later, Wilhelm Niehaus formally appointed Willie and Hans as general agents of the company, with full powers to act for the company, although they were to act jointly in all transactions and contracts relating to real property. Willie became the vice-president and the senior officer of the company in Costa Rica, and was responsible for the company's operations on the Atlantic side of Costa Rica. Hans became the secretary of the company, a position junior in authority to that of the vice-president, and he was responsible for the company's operations on the Pacific side of Costa Rica.

After Willie and Hans Niehaus became officials of the company, they conducted the day-to-day affairs of the company. However, they consulted their father on important questions—usually through correspondence, since Wilhelm Niehaus spent most of his time in Germany—and his decision on any matter was final. This situation was changed by the outbreak of World War II, which disrupted and later severed the channels of communication between Costa Rica and Germany.

At least as early as 1928, Wilhelm Niehaus decided to diversify the company's surplus reserves further, and opened in the company's name a second foreign account in dollars with the Royal Bank of Canada in New York City. Nothing was placed in the New York account, or in the Amsterdam account previously mentioned, except the accumulated profits and surplus reserves of the

---

1. Gmo. is the abbreviation for Guillermo, which is the Spanish version of Wilhelm or William.

company. No separate property of any individual member of the Niehaus family was ever deposited in these accounts. However, certain members of the family had separate individual foreign accounts of their own.

Over the years, Wilhelm Niehaus handled the Amsterdam and New York accounts himself. Although Willie and Hans Niehaus had the power to take action with respect to each of these accounts, such power was never exercised by them prior to their father's heart attack in 1936. After Wilhelm Niehaus had his heart attack in 1936, Willie and Hans became the administrators of both the Amsterdam and New York accounts, but little, if any, action was taken by them under their power to act.

Early in the history of the company, Wilhelm Niehaus began distributing his 2,997 shares in the company among members of his family. As a result of various stock transfers, which are set out in the findings of fact, the shareholdings in the company at the time of the outbreak of World War II in Europe were as follows:

| | |
|---|---|
| Wilhelm | 1 |
| Willie | 517 |
| Hans | 517 |
| Walter | 516 |
| Gertrude | 348 |
| Kurt | 500 |
| Imke | 500 |
| Franz | 50 |
| Horst | 50 |
| Outside the family | 1 |
| | 3,000 |

The single share of stock referred to at the bottom of the list was probably held by Pablo Ziegler Sacher. Hence, at the outbreak of World War II, 1,551 of the company's 3,000 shares were held by residents of Costa Rica, and 1,449 shares were held by residents of Germany.

Although Costa Rica was not directly involved in World War II until December 1941, the outbreak of the European phase of the war in September 1939 af-fected communications between Germany and Costa Rica almost at once. It became difficult, and ultimately impossible, for Willie and Hans Niehaus to consult their father through correspondence concerning important questions of company business, as they had customarily done theretofore. Apparently Willie and Hans exercised complete management control over the company's affairs, and never consulted Wilhelm Niehaus on any company matters, during 1940 or thereafter through the war years.

The company's account with the Royal Bank of Canada in New York City was closed early in 1940, and the company's funds and securities at the Royal Bank of Canada were transferred to new accounts at the Chase Bank and the National City Bank in New York City.

By virtue of Executive Order No. 8389, as amended (12 U.S.C. (1964 ed.) pp. 2091–3), the company's accounts in the New York banks were blocked effective June 14, 1941, because of the ownership of a substantial part of the company's stock by the German plaintiffs. Subsequently, on July 17, 1941, the United States placed the company on its Proclaimed List of Blocked Nationals, and this action had the effect of placing a second block on the company's accounts in the New York banks.

On December 11, 1941, which was four days after Pearl Harbor Day, Costa Rica declared war on Germany.

The Government of the United States placed Willie and Hans Niehaus on the Proclaimed List of Blocked Nationals on February 28, 1942, and similar action was taken with respect to Walter Niehaus on March 27, 1942. This automatically blocked their personal accounts in the New York banks.

By a series of decrees beginning with one dated January 30, 1943, the Costa Rican Government seized and confiscated substantially all of the company's assets in Costa Rica. No external assets of the company in Amsterdam or New York were included in such decrees.

On July 8, 1944, the Costa Rican Department of Foreign Affairs, in an ex-

ecutive order, declared that Willie, Hans, and Walter Niehaus had lost their Costa Rican citizenship. (After the end of the war, the Supreme Court of Justice of Costa Rica held that the executive order just mentioned was unconstitutional.) At about the same time when the executive order relative to their citizenship was issued, Willie, Hans, and Walter Niehaus were arrested by Costa Rican authorities and deported to the United States, where they were interned and held until the end of World War II.

After the end of World War II, Willie Niehaus was released by the United States from internment in January 1946, and Hans and Walter Niehaus were released from internment in April 1946. The three brothers then left the United States and returned to Costa Rica. They found substantially all of the company's property in that country seized and confiscated, and they found the Amsterdam and New York reserve fund accounts blocked and unavailable. Willie and Hans promptly sought to administer the company's affairs, but they were not in a position to conduct any active business. They began an immediate campaign to recover the confiscated property.

Willie and Hans Niehaus endeavored to secure a judicial nullification of the confiscation of the company's property in Costa Rica, but such efforts were unsuccessful. They were successful, however, in securing nullification of the confiscation through executive and legislative action.

The United States abolished the Proclaimed List of Blocked Nationals on July 8, 1946.

As stated earlier in this opinion, Wilhelm Niehaus died in Germany on November 18, 1946. At the time of his death, he owned only one share of stock in the company, and his will left this one share to Walter Niehaus.

The shareholdings in the company as of December 31, 1946, were the same as they had been at the outbreak of World War II, except that the one share of stock owned by Wilhelm Niehaus at the beginning of the war was owned by Walter Niehaus as of December 31, 1946, and Walter's stock had increased from 516 to 517 shares. Of the company's 3,000 shares of stock outstanding, 1,552 were held by residents of Costa Rica at the end of 1946, and 1,448 were held by residents of Germany.

The evidence in the record clearly shows that as of December 31, 1946, no action had been taken to deprive the company of any part of the ownership of the securities and cash in the company's New York and Amsterdam accounts, or to transfer any interest in such assets to the company's shareholders. Consequently, the assets in those accounts at the end of 1946 were the sole and exclusive property of the company, as an entity and juridical person separate and apart from its shareholders. None of the shareholders—neither the German plaintiffs nor the three Niehaus brothers in Costa Rica—had any right, title, or interest of any kind in such assets as of December 31, 1946.

However, Willie and Hans Niehaus, as the executive management of the company, decided early in 1947 to distribute the reserve assets of the company in the New York accounts to the company's stockholders as a partial distribution of capital assets. Accordingly, Willie, Hans, and Walter Niehaus, who were holders of a majority of the company's outstanding shares, met on July 16, 1947, in an extraordinary meeting of stockholders. It was resolved at this meeting to distribute the assets on deposit with the Chase Bank and the National City Bank "among the stockholders of our company in proportion to the stock owned by each," and that orders were to be given to the New York banks to make immediate transfers to Willie, Hans, and Walter Niehaus of their respective portions of the assets. With respect to the portions of the assets in the New York banks due the German plaintiffs, it was decided that such portions were not to be distributed forthwith, but "shall remain in the name of this Company in the respective two banks until such time as the owners arrange for

them." Appropriate orders were given promptly to the New York banks, which effected proportionate transfers of assets from the company's accounts to the personal accounts of Willie, Hans, and Walter Niehaus during the last week in July and early in August of 1947.

In actuality, the stockholders' meeting of July 16, 1947, was invalid because of a failure to comply with the company's charter. Since it was an extraordinary meeting, a special 8-day written notice in advance to all stockholders was required by the charter, and such notice was not given or waived.

Furthermore, even if the stockholders' meeting of July 16, 1947, had been properly called, the resolutions for the transfer of assets would have been illegal and invalid as to the German plaintiffs for another reason. As of the date of the meeting, a special Costa Rican Law No. 26 was in effect, and this law prohibited the transfer of Costa Rican property to Germans without obtaining a license from the Junta de Custodia of Costa Rica. As previously mentioned, the assets on deposit with the New York banks were the property of the company, a Costa Rican enterprise, at the time when the meeting was held on July 16, 1947, and no license was obtained from the Junta de Custodia with respect to the transfer of portions of such assets to the German plaintiffs.

Therefore, the action taken at the stockholders' meeting of July 16, 1947, to transfer the assets in the New York accounts to the company's shareholders, and the subsequent distribution of some of the assets by the New York banks to Willie, Hans, and Walter Niehaus pursuant to the action taken at such meeting, were invalid. The stockholders' meeting of July 16, 1947, did not affect the title to the assets of the company on deposit with the New York banks; none of the company's stockholders received any interest in such assets by reason of the action taken at the meeting; and the company thereafter continued to have the entire right, title, and interest in such assets, to the exclusion of the stockholders.

In June 1948, the Junta de Custodia was abolished in Costa Rica and all of its controls were lifted.

The 1948 annual meeting of the company's stockholders was held on December 15, 1948. This meeting was attended by Willie, Hans, and Walter Niehaus, the three brothers who were residents of Costa Rica, and also by Kurt Niehaus, the owner of 500 shares of the company's stock, who was temporarily in Costa Rica at the time. The stockholders at the 1948 annual meeting went through the double motion of ratifying the resolutions that had been adopted at the extraordinary stockholders' meeting in July 1947 with respect to the transfer from the company to the shareholders of the assets on deposit with the New York banks, and also of adopting a new set of resolutions to the same effect. The undistributed assets remaining in the New York accounts (after the distributions to Willie, Hans, and Walter Niehaus in 1947) were specifically listed and allocated to the German plaintiffs in proportion to their shareholdings in the company, i. e., to Kurt Niehaus on the basis of his ownership of 500 shares in the company, to Gertrude Boese on the basis of her ownership of 348 shares in the company, to Imke Niehaus (now Imke Steinhoff) on the basis of her ownership of 500 shares in the company, to Franz Laue on the basis of his ownership of 50 shares in the company, and to Horst Laue on the basis of his ownership of 50 shares in the company. Willie and Hans Niehaus were authorized to give the New York banks instructions concerning the actual distribution of the remaining assets among the German plaintiffs.

Despite the action that was taken at the annual stockholders' meeting of December 15, 1948, relative to the transfer of the remaining assets in the company's New York accounts among the German plaintiffs, Willie and Hans Niehaus did not instruct the New York banks to make any actual transfers of assets to the

German plaintiffs. As a consequence, these assets remained on deposit with the New York banks in accounts maintained under the name of the company.

The record contains the uncontradicted testimony of an expert on Costa Rican law to the effect that as a result of the action taken at the annual stockholders' meeting of December 15, 1948, the entire beneficial interest in the undistributed assets still on deposit with the New York banks under the company's name was transferred from the company to the German plaintiffs; and that after the meeting of December 15, 1948, the company no longer had any beneficial interest in such assets.

It appears that the opinion of the Costa Rican expert is correct. In the first place, the factor of a notice deficiency, which invalidated the extraordinary stockholders' meeting of July 16, 1947, was not applicable to the meeting of December 15, 1948. The company's charter specifically provides that "The General Meeting of Stockholders shall be held once a year on December 15 without the necessity of a special notice * * * " Furthermore, the Junta de Custodia had been abolished and all of its controls lifted prior to the December 1948 meeting, with the result that Costa Rica no longer imposed any license requirement with respect to the transfer of property to Germans. Also, as already noted, the United States had previously abolished the Proclaimed List of Blocked Nationals.

The defendant contends, however, that the block which Executive Order No. 8389, as amended, placed on the company's accounts in the New York banks effective June 14, 1941, by reason of the ownership of a substantial part of the company's stock by German nationals, had not been lifted as of December 15, 1948. In this connection, there is testimony in the record from the custodian of the pertinent Government records to the effect that a search of such records failed to reveal any information concerning the issuance of any license or licenses relative to the unblocking of such accounts in order to permit the transfers provided for at the annual stockholders' meeting of December 15, 1948.

█ On the other hand, the record contains the testimony of Hans Niehaus (Willie Niehaus having died in the meantime) to the effect that the New York banks notified the company in 1946 that its accounts were free of blocking.[2] Also, as previously stated, the New York banks in late July and early August of 1947 honored instructions from Willie and Hans Niehaus by transferring assets from the company's accounts to the personal accounts of Willie, Hans, and Walter Niehaus. Hence, the circumstantial evidence in the record warrants the inference that the company's accounts with the New York banks had been unblocked prior to December 15, 1948, and that Executive Order No. 8389, as amended, was not an impediment on that date to the effective transfer from the company to the German plaintiffs of the entire beneficial interest in the undistributed assets still remaining in those accounts. However, the New York banks continued to hold these assets in deposits under the company's name until the time of the issuance of the vesting order on July 26, 1951.

In addition to the assets previously discussed, the vesting order also covered certain dollar assets which the company maintained in its account with the de-Bary Bank in Amsterdam during World War II, and for a time thereafter. Prior to the end of World War II, the Dutch Government blocked the company's account with the deBary Bank. Following the end of the war, proceedings were begun in 1950 to unblock and release the deBary account. This was undertaken by Willie Niehaus, who went to Amsterdam for this purpose pursuant to an authorization that was granted at a stockholders' meeting on September 22, 1950. Willie was successful in arranging for the release of the deBary account from blocking, and he also made arrangements to have the dollar assets in the deBary ac-

2. The banks' records for the pertinent period have been destroyed.

count transferred to the company's account with the Chase National Bank in New York City.

When the time arrived for the holding of the regular annual meeting of the company's stockholders on December 15, 1950, Willie Niehaus was still in Holland on the mission mentioned in the preceding paragraph. Since none of the German plaintiffs was in Costa Rica at the time, and since Hans and Walter Niehaus together owned only 1,034 of the company's shares, it was not possible to obtain a quorum for a stockholders' meeting on December 15, 1950. In this connection, the company's charter provides in pertinent part as follows:

> * * * To constitute a quorum at a General Meeting of Stockholders, a majority of the shares issued must be represented, unless otherwise stipulated. However, if there is not a quorum on the date set for the Meeting, another date shall be set, and the meeting shall be held on that date with the shareholders present, whatever the number. * * *

A stockholders' meeting was held on January 8, 1951. It was attended by Willie Niehaus (the owner of 517 shares), Hans Niehaus (the owner of 517 shares), and Walter Niehaus (the owner of 517 shares). The minutes of that meeting contain the following statement (among others):

> *Second Article:* Due to the absence of Mr. Willie Niehaus * * * from the country on the day when the annual ordinary meeting is usually held, that is, December 15th, it was agreed to postpone the meeting until today.

Action was taken at the meeting of January 8, 1951, to transfer to the stockholders of the company, pro rata, the dollar assets (cash and securities) which had been released from blocking in Holland and transferred to the company's account with the Chase National Bank in New York City. Willie and Hans Niehaus were empowered to instruct the Chase National Bank to distribute to Willie, Hans, and Walter Niehaus their respective portions of such assets; and

actual distributions were thereafter made by the bank to these three brothers. With respect to the portions of the assets due the German plaintiffs, it was resolved "that the remainder of the securities and cash be left in the account of Guillermo Niehaus & Co. in the said Bank until the termination of the proceedings which will be initiated by the legal owners, so that these securities may be transferred to them."

The respective portions allocated to the German plaintiffs at the stockholders' meeting of January 8, 1951, out of the dollar assets which had been released from blocking in Holland and transferred to the company's account with the Chase National Bank in New York City, were still being held by the Chase National Bank in the account under the company's name at the time when the vesting order was issued on July 26, 1951.

The expert on Costa Rican law, previously mentioned in another connection, has given uncontradicted testimony to the effect that as a result of the action taken at the stockholders' meeting of January 8, 1951, the entire beneficial interest in the dollar assets which had been released from blocking in Holland and transferred to the company's account with the Chase National Bank in New York City was transferred to the company's shareholders; and that after the meeting of January 8, 1951, the company did not have any beneficial interest in such assets.

The defendant argues, however, that the stockholders' meeting of January 8, 1951, was an extraordinary meeting rather than a regular annual meeting; that the 8-day notice required by the company's charter with respect to extraordinary meetings was not given to all the company's stockholders; and, accordingly, that the meeting of January 8, 1951, was invalid and ineffective to transfer interests in assets from the company to the stockholders.

With respect to the defendant's contention mentioned in the preceding paragraph, it has been previously noted that the company's charter specifically pro-

vides that "if there is not a quorum on the date set for the [annual] Meeting, another date shall be set, and the meeting shall be held on that date * * *." Also, the minutes of the meeting of January 8, 1951, clearly show that it constituted the annual meeting, which had been postponed from December 15 because of the lack of a quorum of stockholders in Costa Rica on December 15, 1950. The company's charter does not expressly require that an 8-day advance notice be sent to all stockholders concerning the new date of the annual meeting when there is no quorum on the date prescribed by the charter for such meeting; and we do not believe that this court would be justified in impliedly amending the charter by reading such a requirement into it.

Hence, it appears that the Costa Rican expert has given a correct opinion with respect to the validity of the stockholders' meeting of January 8, 1951, and the effectiveness of the action taken at that meeting to transfer from the company to the company's stockholders, pro rata, the entire beneficial interest in the dollar assets which had recently been transferred from the deBary account to the company's account with the Chase National Bank.

■ There is one further point that should be mentioned. The defendant has argued that a regulation, known as Military Government Law No. 53, which was promulgated in September 1945 by the Military Government in Occupied Germany, and which required residents of Occupied Germany to register external assets with the Military Government and authorized the Military Government to control such assets, invalidated the actions taken at the stockholders' meetings of December 15, 1948, and January 8, 1951, in so far as they transferred to the German plaintiffs interests in the New York assets. However, the regulation issued under the authority of the Military Government in Occupied Germany could not have extraterritorial effect to the extent of inhibiting Willie, Hans, and Walter Niehaus—citizens and residents of Costa Rica and owners of a majority of the company's stock—at the stockholders' meetings of December 15, 1948, and January 8, 1961. With respect to the German plaintiffs, the evidence in the record shows that the Military Government on February 21, 1951, unconditionally released the shares of stock in the company that had previously been registered with it pursuant to Military Government Law No. 53. Hence, the German plaintiffs were free on and after February 21, 1951, to receive any benefits due them from their ownership of stock in the company.

On the basis of the previous discussion, it seems that at the time when the vesting order was issued on July 26, 1951, the entire beneficial interest in the property covered by that order was owned by the German plaintiffs; that the German plaintiffs acquired the beneficial interest in some of the assets for the first time effective December 15, 1948; and that the German plaintiffs acquired the beneficial interest in the remainder of the assets effective January 8, 1951.

■ Therefore, the vesting order was unlawful under the prior decisions of this court to the effect that the vesting power of the Attorney General as of July 26, 1951, did not extend to property in the United States acquired by Germans after December 31, 1946.

■ Moreover, if the defendant were correct in arguing that the actions taken at the stockholders' meetings of December 15, 1948, and January 6, 1951, were ineffective to transfer to the German plaintiffs interests in the assets on deposit with the New York banks, it would still seem that the vesting order was unlawful. The order seized the property in the accounts with the New York banks under the company's name on the basis of findings to the effect that the vested property actually belonged to the German plaintiffs, and that they were residents and nationals of Germany, an enemy country. These findings were phrased in accordance with the provisions of Executive Order No. 9095, as amended (50 U.S. C.App. (1964 ed.) pp. 9507–8). That

order, *inter alia,* authorized the vesting under the Trading With the Enemy Act, as amended, of "any * * * property or interest within the United States of any nature whatsoever owned or controlled by, payable or deliverable to, held on behalf of or on account of, or owing to, or which is evidence of ownership or control by, a designated enemy country or national thereof * * *," but declared "That persons not within designated enemy country * * * shall not be deemed to be nationals of a designated enemy country unless" certain specified determinations were made. There was no finding in the vesting order of July 26, 1951, that the company, a Costa Rican entity, came within the category of an enemy national, either by reason of the ownership of stock by the German plaintiffs or any other factor. Consequently, if the company had still been the owner of the assets in the New York accounts under its name as of July 26, 1951, the vesting order of that date would not have provided a proper basis for the seizure of the company's property.

## II

A. In the brief which the defendant filed on December 6, 1965, before the trial commissioner, after the formal closing of the proof on July 29, 1965, the defendant asserted for the first time an affirmative defense to the effect that even if the order of July 26, 1951, unlawfully vested property of the German plaintiffs, the maintenance of the present action by the German plaintiffs is barred by the Convention on the Settlement of Matters Arising Out of the War and the Occupation, which was signed at Bonn on May 26, 1952, by representatives of the United States, the United Kingdom, and the French Republic, on the one side, and a representative of the Federal Republic of Germany, on the other side (6 UST p. 4412 et seq.) The plaintiffs, in their reply brief before the trial commissioner, strenuously objected to this defense, on the ground that it came too late in the progress of the case toward final disposition.

■ Commissioner White ruled that the plaintiffs' objection should be upheld, and we agree with his reasoning. The assertion of this defense at such a late stage in the proceedings was contrary to the provision in Rule 19(b)—formerly Rule 15(b)—stating that "In pleading to a preceding pleading, a party shall set forth affirmatively * * * any * * matter constituting an avoidance or affirmative defense." The provision just quoted, which in mandatory language required the defendant to state its affirmative defenses, if any, in its initial pleading and thus alert the plaintiffs and the court early in the case to such matters, is a salutary one from the standpoint of orderly procedure. Furthermore, if this provision is to have any real effect on the actual processing of cases, it should be enforced in appropriate situations. The present situation appears to be an appropriate one for the invocation of the rule. For these reasons, the Commissioner exercised the authority vested in him by Rule 52(a) by sustaining the plaintiffs' objection and striking from the defendant's brief the affirmative defense based upon the Settlement Convention. We hold that he did not act improperly.

B. Before the court, defendant has argued that the defense based on the Settlement Convention is jurisdictional and may therefore be raised at any time. Under Article 3(2) of Chapter Nine of the Convention:

The Federal Republic recognizes that no claims of any kind arising out of acts or omissions of the Three Powers or any one of them, or of organizations or persons who have acted on their behalf or under their authority, which took place in respect of Germany, German nationals or German property, or in Germany, between 5 June 1945 and the entry into force of the present Convention [May 5, 1955], may be asserted by the Federal Republic or by persons subject to its jurisdiction against the Three Powers or any one of them or against organizations or persons who have acted on their behalf or under their authority.

This provision, defendant urges, bars the plaintiffs' claim even if the vesting order was issued without authority, and, moreover, deprives this court of any jurisdiction it would otherwise have.

■ We do not think that this Convention provision is jurisdictional in the sense that it narrowed the pre-existing power of this court. A treaty, can, of course, limit the court's jurisdiction (Hannevig v. United States, 84 F.Supp. 743, 114 Ct.Cl. 410 (1949)), but the issue always is whether the particular treaty-provision had that effect or merely established a substantive rule to be applied by the courts like other substantive legislation is applied. *Hannevig* dealt with a treaty which provided specifically for international arbitration of the very claim on which suit had been filed in this court; naturally, the court concluded "that our jurisdiction of plaintiff's claim has been effectually withdrawn." Id. 84 F.Supp. at 745, 114 Ct.Cl. at 415. See Seery v. United States, 130 Ct.Cl. 481, 490 (1955).

The Bonn Convention, on the other hand, is more easily read as doing away with certain rights Germany and its nationals might otherwise have had—rather than as affecting this court's jurisdiction under 28 U.S.C. § 1491, or any other court's jurisdiction (including that of international tribunals). The treaty is framed in terms of personal and national rights and claims, not in terms of judicial power or authority. It does not seem to speak any differently than a substantive Congressional statute which rearranges rights and cuts off possible claims without affecting judicial power or repealing *pro tanto* a general grant of jurisdiction like 28 U.S.C. § 1491. Cf. Ralston Steel Corp. v. United States, 340 F.2d 663, 169 Ct.Cl. 119 (1965), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L. Ed.2d 723; Eastport S. S. v. United States, Ct.Cl., 372 F.2d 1002, decided Feb. 17, 1967. So far as we can see, the objectives of the treaty-waiver will be adequately served by interpreting the provision as substantive and not jurisdictional.

In the past the courts do not appear to have treated international post-war waivers (comparable to the Bonn Convention) as jurisdictional clauses, but simply as substantive provisions of law depriving the claimant of possible rights. Ribas y Hijo v. United States, 194 U.S. 315, 24 S. Ct. 727, 48 L.Ed. 994 (1904), involved a claim for a Spanish ship seized by United States armed forces during the Spanish-American War. The Supreme Court first held that the seizure, being an act of war occurring in military operations, was, if anything, a tort outside the reach of the Tucker Act. The Court then added that, "besides", the waiver in the peace treaty clearly embraced plaintiff's claim. This part of the opinion seems to have been a decision on the merits of an affirmative defense; in any event, there was no clear jurisdictional holding on the treaty point. In Herrera Nephews v. United States, 43 Ct.Cl. 430 (1908), aff'd 222 U.S. 558, 32 S.Ct. 179, 56 L.Ed. 316 (1912), another claim for a Spanish-American War ship seizure was rejected by this court as tortious. The court then referred, in addition, to the treaty waiver (43 Ct.Cl. at 441–442), and concluded (id. at 444):

> For the reasons we have given we must hold that the court is without jurisdiction; and we may add that if we should take jurisdiction we should feel constrained under the wording of the treaty to apply it in this case, so that in either event the claimants must fail; and for that reason their petition is dismissed.

This was a plain holding that the treaty waiver went to the claimants' substantive rights, not the court's jurisdiction. The Supreme Court's affirming opinion does not appear to indicate any other view (see 222 U.S. at 568, 574, 32 S.Ct. 179). Defendant relies on Munich Reinsurance Co. v. First Reinsurance Co., 6 F.2d 742 (C. A. 2, 1925), appeal dismissed, 273 U.S. 666, 47 S.Ct. 458, 71 L.Ed. 830 (1927), but there is nothing in the opinion on the treaty-waiver defense as a jurisdic-

tional matter.[3] The case applies the treaty, so it appears to us, as a substantive defense. In two recent decisions under the former Congressional reference practice, this court dealt on the merits with treaty waivers growing out of World War II (though it is fair to say that the precise jurisdictional issue raised by defendant in the present case was not before the court). Pauly v. United States, 152 Ct.Cl. 838, 844 (1961); S. N. T. Fratelli Gondrand v. United States, 166 Ct.Cl. 473, 478–480 (1964). In the latter, in particular, the court acted as if the waiver was merely a substantive defense, saying (id. at 478) "We have power, then, to consider the whole case and, as part of the case, to evaluate the Treaty defense."

For these reasons, we conclude that the treaty-waiver defense should not be treated as jurisdictional, and therefore that we can refuse to consider it because presented too late in the litigation.

C. In any event, we add our view that this treaty-waiver, despite the breadth of its wording, was not intended to cover claims like the individual plaintiffs'. As shown elsewhere in this opinion, the individual plaintiffs' rights in the seized property did not arise until December 1948 and January 1951, and therefore could not be vested by the Attorney General under the Trading With the Enemy Act because acquired after December 1946. By refusing to vest property in the United States acquired by Germans after that date, the Federal Government indicated that such property was not war-connected. It follows that, so far as this property was concerned, the plaintiffs' claim against the United States was not war-connected, nor did it arise out of the occupation of Germany. It was as if the property was brought into this country from Germany in 1948 and 1951, for sale here or other lawful purposes, and was then seized illegally by the Federal Government. See the earlier decisions in this case, 153 F.Supp. 428, 139 Ct.Cl. at 608, 611, and 170 F.Supp. 419, 145 Ct.Cl. at 175–176. It is reasonable to construe the treaty-waiver as inapplicable to such a claim, unconnected with World War II or the post-war occupation. The Senate Foreign Relations Committee, in reporting the Convention, described the waiver as pertaining to the claims "arising out of any action by the Allied Powers during the course of hostilities" and "during the period of occupation" (S.Exec.Rep.No.16, 82d Cong., 2d Sess., p. 28 (1952)) and, again, referred to the waiver "of all claims arising out of the war or out of any subsequent occupation period * * *" (id. at 44). We think that the high contracting parties did not intend to release the claims of Germans whose property, brought into the United States after 1946, was unlawfully confiscated by the Federal Government, or the rights of Germans who acquired other non-war claims (in this country) against the United States between June 1945 and May 1955—including property here which was first acquired in a period freed from vesting under the Trading With the Enemy Act.

### III

For the first time in this litigation, defendant has raised in its presentation to the court, on appeal from Commissioner White's recommended opinion and decision, another sweeping defense which it also characterizes as jurisdictional. This defense is that, upon the 1941 amendments to the Trading With the Enemy Act, each of the German plaintiffs, as shareholders, automatically acquired by operation of law a severable interest in the corporate assets in New York of Gmo. Niehaus & Company, proportionate to

3. The court notes (6 F.2d at 747) that it is entitled to take judicial notice of the Treaty of Berlin, ending World War I (insofar as this country was concerned). Why the opinion referred to "judicial notice" we do not know; the defendant speculates that the court was considering the waiver issue *sua sponte* for the first time on appeal, and thought it could do so because the defense was a jurisdictional one; but there can be many other reasons, literary and substantive, for saying that the court took judicial notice of the treaty.

their shareholdings; and that such interest was subject to vesting under the Act at any time up to December 31, 1946, and remained subject to vesting until the termination of the entire vesting program in 1953. It follows, defendant says, that the 1951 vesting order was wholly valid in every way[4] since it vested property in which enemies had the full interest prior to the magic date of December 31, 1946.

This is a ten-year belated defense. The facts and the legal materials on which it rests were known when this suit was begun in November 1956. They were known when the court rendered its first decision in the case in July 1957 and its second decision in February 1959. They were known when the case was proceeding before the trial commissioner. In sum, they were known at all times up to August 2, 1966, when the Government first raised the point in its brief to the court excepting to the trial commissioner's recommendations. There is no adequate reason why the defense should not have been made at the time of the defendant's first motion to dismiss in 1957. Many steps in the proceeding have been taken, and much evidence heard, which would have been totally unnecessary if this new defense had been presented and sustained. Under the rules which govern the raising of defenses in this and other courts, we would summarily refuse to entertain the point at this stage if we were not constrained to agree with defendant that it is jurisdictional. For, if this new defense is good, the pre-1947 property of enemy claimants would have been lawfully seized under the Trading With the Enemy Act, and this court would have no jurisdiction of a suit by such enemies to recover the value of their property. See Deutsch-Australische Dampfschiffs-Gesellschaft v. United States, 59 Ct.Cl. 450 (1924); Escher v. United States, 68 Ct.Cl. 473 (1929), cert. denied, 281 U.S. 752, 50 S.Ct. 353, 74 L. Ed. 1163 (1930); N.V. Montan Export-Metaal, etc. v. United States, 102 F.Supp.

1016, 122 Ct.Cl. 42 (1952); Gmo. Niehaus & Co. v. United States, 153 F.Supp. 428, 139 Ct.Cl. 605 (1957). Accordingly, we have considered the merits of the defense, delayed though it be, and have taken account of the elaborate arguments on the merits presented by both sides. But giving due weight to what defendant says, we cannot agree that the defense is valid.

Under the far-reaching terms of Section 5(b) of the Trading With the Enemy Act, 50 U.S.C.App. § 5(b), as added in 1941, the President probably could have directed, if he had thought it wise, that the proportionate "interest" of enemy stockholders in the assets of a non-enemy corporation could or would be deemed their own "property" and subject to separate vesting and seizure, just as he authorized the vesting of the enemies' shares of stocks in these corporations. Cf. Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 483–486, 68 S.Ct. 174, 92 L.Ed. 88 (1947); Silesian-American Corp. v. Clark, 332 U.S. 469, 475–477, 68 S.Ct. 179, 92 L.Ed. 81 (1947). For us the crucial fact is that he gave no such direction or authorization, and the Government did not—except in special circumstances (not pertinent here)—treat an enemy shareholder's "proportionate interest" in such corporate property as a "severable interest" or separate property which was itself subject to vesting and was to be considered for the Act's purposes as enemy-owned property.

The power to vest enemy property was given in Executive Order No. 9095, March 11, 1942, as amended from time to time (see 50 U.S.C.App. § 6, note). This directive permitted the seizure of all the United States assets of foreign non-enemy corporations as to which certain determinations were made; enemy-owned shares of stock could also be seized; but no provision was made for separately seizing the "proportionate" or "severable" "interest" of the enemy shareholders in the company's assets. Defendant would apparently have us find this au-

---

4. Except perhaps for a small amount of money brought into this country after 1946.

thority in the catch-all authority to vest "any other property or interest within the United States of any nature whatsoever owned or controlled by, payable or deliverable to, held on behalf of or on account of, or owing to, or which is evidence of ownership or control by, a designated enemy country or national thereof." The difficulty is that this provision was not interpreted, so far as we are informed, to cover a shareholder's "proportionate interest" in the corporate assets. Defendant is unable to point to any compulsory vesting orders seizing such a "proportionate interest", and we know of none.[5] The position of the Alien Property Custodian and his successor, the Attorney General, seems to have been that these undifferentiated "shares" of assets should not normally be considered enemy property or interests. Consistently with that position, the terms of the vesting order in this case give no indication of reflecting the view that shareholders' "proportionate interests" were being vested. On the contrary, the order is phrased as if the vested property was owned outright, in the ordinary sense, by the German plaintiffs.

Perhaps the reason why the President, the Custodian, and the Attorney General did not—during the period vesting was allowed—provide for the seizure of unsevered, "proportionate", enemy "shares" or "parts" of the corporate assets of non-enemy companies is that such plucking out of underlying components of the companies' properties could have created havoc in the carrying on of their businesses. If enemy-owned shares of stock are seized, the business itself can continue to operate because the underlying assets are undisturbed; the Custodian merely becomes a stockholder. If *all* the underlying assets are seized, the Custodian can continue to operate the enterprise as a whole. But if the Custodian seizes 10% or 30% or 50% of the *assets* as enemy "owned" (under the "severable" or "pro-

portionate" "interest" theory), leaving the remainder in the company's hands as free of enemy taint, it is hard to see how the business could survive as an entity.

The judicial decisions which defendant invokes do not hold or suggest that such proportionate parts of the underlying assets could be, or were being, treated as vestible property, or as "enemy-owned" for the general purposes of the Trading With the Enemy Act. The two *Uebersee* cases (Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947), and Uebersee Finanz-Korp., A. G. v. McGrath, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888 (1952)) dealt, not with the scope of vesting, but with the right to sue under Section 9(a) of the Act. The Court's theory is fully consistent with the view that separate parts of a company's assets, "attributable" to enemy shareholders, are not separately vestible. Kaufman v. Societe Internationale, 343 U.S. 156, 72 S.Ct. 611, 96 L. Ed. 853 (1952), protected the rights of innocent shareholders where all the assets of enemy-tainted corporation had been vested. The opinion did not turn upon a shareholder's separate ownership of a part of the assets but, rather, upon the principle-of-fairness that Congress did not intend to confiscate the rights of innocent stockholders "merely because some others who have like interests are enemies." See 343 U.S. at 159, 160, 72 S.Ct. 611. Again, the Court's theory is thoroughly consistent with an executive refusal to treat enemy "proportionate interests" as separately vestible property.

 In sum, we find no adequate support for the Government's new defense, and reject it as unwarranted by administrative practice and judicial decision. Neither of the new defenses—the waiver in the Bonn Convention, or the theory of a shareholder's "severable interest" in corporate assets—stands in the way of the individual plaintiffs' recovery. For the reasons given in Part I, supra,

---

5. United States v. Algemene Kunstzijde Unie, 226 F.2d 115, 118 (C.A.4, 1955), cert. denied, 350 U.S. 969, 76 S.Ct. 433, 100 L.Ed. 841 (1956), involved a vesting order entered into by agreement, and the decision was limited to that special circumstance.

we hold that the German plaintiffs are entitled to recover for the unlawful vesting of their property under the order dated July 26, 1951. The company, on the other hand, did not have any beneficial interest in the vested property, and it is not entitled to recover.[6]

## IV

It becomes necessary, therefore, to determine the amount of the recovery by the German plaintiffs.

In its decision denying the defendant's motion to dismiss the petition in the present case, the court indicated that the plaintiffs' suit was to be treated as one for the value of the property seized under the vesting order (153 F.Supp. 428, 139 Ct.Cl. at p. 607). The court apparently was analogizing the the present action to the numerous cases in which courts have adjudicated claims for just compensation under the Fifth Amendment to the Constitution on account of the taking of property by the United States. The measure of damages in such cases is the value of the property at the time of the taking. United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943); Potts v. United States, 126 F.Supp. 170, 173, 130 Ct.Cl. 88, 94 (1954).

The "unlawful exaction" cases, such as Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505 (1954), cert. denied 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 and Seatrade Corp. v. United States, 285 F.2d 448, 152 Ct.Cl. 356 (1961), also seem analogous to the present case. In the cases just cited, the Federal Maritime Commission had unlawfully exacted money from the claimants as a precondition to favorable actions on certain matters pending before the Commission. The claimants were allowed to recover only the amounts unlawfully exacted from them.

As indicated earlier in this opinion, the United States seized under the vesting order involved in this case a total of $76,535.83 in cash and numerous securi-

ties. The evidence in the record does not show the exact market value of the vested securities at the time of the seizure, except that it amounted to "something over $500,000."

With the exception of 190 shares of common stock issued by the International Nickel Co., all the vested securities were sold by the defendant during the period that began on February 8 and ended on November 18, 1952. The proceeds from such sales amounted to a total of $514,811.71. During the period up to November 18, 1952, dividends on the vested securities amounting to a total of $11,015.41 were received by the defendant. Thus, the defendant now holds the sum of $602,362.95 in cash, representing the cash that was originally vested, the proceeds from sales of vested securities, and dividends on vested securities received by the defendant up to November 18, 1952.

In the absence of more precise evidence on the point, it would seem reasonable to hold that the vested cash and the vested securities which were subsequently sold by the defendant had a total value of $602,362.95 at the time of the vesting.

The plaintiffs contend, however, that if the defendant had not sold the vested securities previously mentioned, but had held them and had exercised rights under them, the defendant would now hold cash and securities having a value of more than $2,000,000 as a result of the vesting of the German plaintiffs' property on July 26, 1951; and that the German plaintiffs are entitled to recover more than $2,000,000 in the present action. It is the plaintiffs' theory that the defendant, after unlawfully seizing the vested securities, was under a duty to retain them and to exercise rights under them, and that the defendant is liable to the German plaintiffs for all the consequences flowing from the defendant's failure to discharge such duty.

In this connection, it should be noted that Section 7(c) of the Trading With

6. Furthermore, since the company was not an enemy national, any suit by the company growing out of the vesting order would have to be instituted in a United States District Court because of restrictive language contained in Sections 7(c) and 9(a) of the Trading With the Enemy Act.

the Enemy Act, as amended (50 U.S.C. App. § 7(c) (1964)), provides that in a case involving the unlawful vesting and the subsequent sale by the Alien Property Custodian of the property of a person who was not an enemy national, any recovery by the owner of the property "shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States." It would be anomalous indeed if enemy nationals whose property was unlawfully vested were given a more generous remedy than persons outside the category of enemy nationals. For example, an American citizen or a friendly alien whose property was mistakenly vested in 1945 as German-owned would receive, as the result of a successful suit under Section 9(a), only the net proceeds of property sold by the Custodian. Becker Steel Co. v. Cummings, 296 U.S. 74, 56 S.Ct. 15, 80 L.Ed. 54 (1935). Although this limitation of the Trading With the Enemy Act may not be strictly applicable in terms to plaintiffs' case, we should be governed by its indication of the Congressional policy as to maximum recovery. Neither the post-sale increment in value nor interest is recoverable under Section 7(c), and neither should be recoverable here. Cf. Sac & Fox Tribe of Indians of Oklahoma v. United States, Ct. Cl. Appeal No. 9–65, decided this day, Part VI of that opinion.

Plaintiffs appear to make some claim of entitlement under the Just Compensation Clause of the Fifth Amendment, but in its first decision in this case the court clearly held that this was a case "founded upon an Act of Congress" (139 Ct.Cl. at 612) and we are therefore justified in treating the basis of the claim as statutory, not constitutional. Cf. Eastport S.S. Corp. v. United States, Ct.Cl., 372 F.2d 1002 decided Feb. 17, 1967. In non-eminent domain cases the normal rule is that interest is not recoverable unless authorized by statute or contract. 28 U.S. C. § 2516(a). In this instance there is neither statutory nor contractual authorization. On the contrary, Section 7(c) of the Trading With the Enemy Act looks the other way.

■ Accordingly, we conclude that the court should adhere to the view previously indicated, to the effect that the German plaintiffs should be allowed the proceeds of the vested property, representing its value at the time of vesting. On that basis, those plaintiffs are entitled to recover the amount of $602,362.-95, on account of the vested property other than the International Nickel Company stock.

■ As mentioned earlier in this opinion, the defendant did not sell 190 shares of common stock issued by the International Nickel Company. The defendant endeavored to sell these particular securities in November 1951, but the proposed sale could not be effected because of prior claims to the stock by the Canadian Alien Property Custodian. The original 190 shares of International Nickel Company stock, together with a 100-percent stock dividend thereon and cash dividends amounting to $6,770.21, as of April 30, 1964, are still being held subject to the authorization of the Canadian Custodian. The plaintiffs recognize that this court cannot direct restitution in kind (see 139 Ct.Cl. at 607), and that they are not entitled to an unconditional money judgment in view of the interest of the Canadian authorities. We adopt plaintiffs' suggestion and hold that they are entitled to recover the value of the International Nickel Company stock and dividends, as of the date of judgment, but conditioned as to payment and collection upon the authorization of the Canadian Custodian. In this instance we allow the value as of the date of judgment because Sections 7(c), 9(a), and 23 of the Trading With the Enemy Act, 50 U.S.C.App. §§ 7(c), 9(a), and 23, appear to permit recovery of that amount where property has been retained by the Alien Property Custodian and not sold. Cf. Henkels v. Sutherland, 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed. 953 (1926); Becker Steel Co. v. Cummings, supra, 296 U.S. 74, 81, 56 S.Ct. 15, 80 L.Ed. 54 (1935); Pflueger v. United States, 73 App.D.C.

364, 121 F.2d 732, 735–736 (1941), cert. denied, 314 U.S. 617, 62 S.Ct. 98, 86 L.Ed. 497. It is fitting, though it may not be mandatory, to apply these statutory provisions by analogy, as indicating the Congressional view of the appropriate relief.

The individual plaintiffs are entitled to recover and judgment is entered to that effect. The precise amount of recovery will be determined under Rule 47(c) pursuant to this opinion. The judgment will contain the specified condition as to the International Nickel Company stock. Plaintiff Gmo. Niehaus & Co. is not entitled to recover and the petition is dismissed as to that plaintiff.